## RALLS v. WYAND *et al.*

No. 5761.   Opinion Filed January 13, 1914.

(138 Pac. 158.)

1. **STATUTES—Referendum Petition—Time for Filing.** Section 3, art. 5, Williams' Ann. Const. Okla., provides: ''Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the Legislature which passed the bill on which the referendum is demanded. * * *'' Held mandatory, and that such petition must be filed with the Secretary of State within 90 days after the final adjournment of the Legislature.

2. **STATES — Legislature — Quorum — Delegation of Power.** Under section 30, art. 5, Williams' Ann. Const. Okla., a majority of each house is necessary to transact business, and the power lodged by the Constitution in the majority cannot be delegated to a minority.

3. **SAME.** A concurrent resolution adopted by the House on June 30th and the Senate on July 1st, directing that, upon the adjournment of each of said days, the said bodies should adjourn until July 5, 1913, at 12 o'clock m., when the roll of each should be called, and a quorum not appearing, that the presiding officers thereof should adjourn their respective bodies without day, held to be an unwarranted delegation of authority to a minority, and is therefore void.

4. **SAME—Legislature—Sessions—Journals.** The journals must show proceedings to establish a legislative session. In the absence of such showing by the journals there is no session.

5.    SAME—Termination.  Where the journals do not show any pro-
      ceeding of the House after the 30th of June, or of the Senate
      after July 1st, except a meeting of a minority of the members of
      each body on July 5th, there was no legislative session of either
      body subsequent to June 30th and July 1st, respectively.

6.    STATUTES—Legislature—"Session."  The meaning of the word
      "session" is the sitting of a body, competent for the transac-
      tion of its business; the time during which it is convened and
      actually engaged in business; the time during which a legisla-
      tive body or other assembly sits for the transaction of business.

(Syllabus by the Court.)

Joseph G. Ralls filed a protest against Referendum Petition
No. 28, State Question No. 65. The protest was denied by Ben-
jamin F. Harrison, Secretary of State, and protestant appeals.
Protest sustained.

The Legislature of the state of Oklahoma passed "An act
providing for the permanent location of the seat of government
and capitol of the state of Oklahoma, and creating a Board of
Capitol Commissioners, and defining its powers and duties," etc.,
etc.  Section 1 of the act provides that: "The seat of govern-
ment and capitol of the state of Oklahoma shall be and is hereby
established at Oklahoma City, in the county of Oklahoma, in
said state." Sess. Laws 1910-11, c. 5, pp. 5, 6, 7.

What is known as House Bill No. 72, entitled "An Act pro-
viding for the building of the state capitol at the seat of govern-
ment of the state; making an appropriation therefor, and repeal-
ing sections 2, 3, 4, 5, 6 and 7 of chapter 5 of the Session Laws
of 1910 and 1911," was approved May 23, 1913. Sess. Laws
1913, c. 220, pp. 584-597.

A referendum petition was filed in the office of the Secretary
of State on October 2, 1913, asking that "House Bill No. 72 be
referred to the people of the state for their approval or rejec-
tion, at the regular election to be held on the 3d day of Novem-
ber, A. D. 1914." This is styled "Referendum Petition No. 28,
State Question No. 65," and was presented in the office of the
Secretary of State by Messrs. Wyand and Swearingen, the ap-
pellees. The gist of the proposition in said referendum petition
is to repeal said chapter 220 of the Session Laws of 1913, which
is House Bill 72.

As against the sufficiency of said referendum petition, Joseph G. Ralls, the appellant, filed with the Secretary of State, on the 11th day of October, 1913, a protest, and, after notice by the Secretary to the appellees, a hearing was had on the 5th day of November, 1913, and said protest denied, and from this decision an appeal was perfected to this court by appellant. An order was made by this court on November 25, 1913, appointing Mr. J. B. Dudley referee, whose duty it was "to take testimony as to the date on which the Extraordinary Session of the Fourth Legislature of the state of Oklahoma adjourned, and report his findings of fact thereon."

With reference to the matter submitted to him, the referee reports, and the court adopts his findings, as follows:

"That on June 28, 1913, the House of Representatives adopted the following resolution, known as House Concurrent Resolution No. 29, to wit: 'Be it resolved by the House of Representatives, the Senate concurring therein, that the President *pro tempore* of the Senate and Speaker of the House, are hereby directed, upon the adjournment of their respective houses, to adjourn the same to the 5th day of July, 1913, at 12 o'clock m., when the roll call of each house shall be called, and immediately thereafter the presiding officer of each house shall cause the presiding officer of the other to be informed whether or not a quorum of its body has appeared; and thereupon, if a quorum of the two houses, respectively, shall not have appeared upon such call of the roll, the President *pro tempore* of the Senate and the Speaker of the House of Representatives shall immediately adjourn ther respective houses without day.' (This resolution was adopted by the House by 71 yeas, noes none; members absent 26.) And thereupon the Speaker declared the resolution adopted and signed the same in open session. (House Journal, pp. 1296, 1297.)

"That on June 30, 1913, the concurrent resolution was adopted by the Senate, and a committee was appointed to inform the House of such fact. The Senate adjourned until 9:30 a. m. Tuesday, July 1, 1913. (Senate Journal, p. 1703.)

"That on June 30, 1913, the proceedings with reference to the adjournment of the House were as follows: 'On motion by Mr. Riddle, the Speaker was instructed to adjourn the House until July 5th under the terms of House Concurrent Resolution No. 29.' (House Journal, p. 1395.)

"That on July 1, 1913, the proceedings with reference to the recess of the Senate were as follows: 'On motion of Senator Memminger, the Senate recessed in accordance with House Concurrent Resolution No. 29, until Saturday, July 5, at 12 o'clock m.' (Senate Journal, p. 1710.)"

The referee, continuing his report, states the House proceedings as follows:

"Seventy-Third Day's Session. Saturday, July 5, 1913. 12 o'clock, m. The House of Representatives met at 12 o'clock m. July 5, 1913, Mr. Speaker, J. H. Maxey, presiding. The roll was called, which showed the following members present: Ashby, Bolen, Brown, DeFord, Haynes, Veatch, Wright, Mr. Speaker (J. H. Maxey), total 8.

"The same not being a quorum, the Speaker informed the President *pro tempore* of the Senate of such fact, that is, that only eight members were present, and a quorum had not appeared. And the President *pro tempore* of the Senate sent a messenger to the House, informing the House that the Senate met at 12 o'clock m., July 5, 1913, and the roll being called, only the following members were present: Aycock, Edmondson, Kendrick, McMecham, Tucker, Vandeventer, a total of 6, and the same not being a quorum of the Senate. (House Journal, pp. 1396, 1397.)"

That on the same day, July 5, 1913, the House of Representatives was declared adjourned, pursuant to said Concurrent Resolution No. 29. The proceedings with reference thereto are as follows:

"And it now appearing that a quorum of neither the House of Representatives nor the Senate of said state having appeared and answered the roll call, the said Speaker, J. H. Maxey, made the following announcement: 'Pursuant to House Concurrent Resolution No. 29, under and by virtue of the terms thereof, I, J. H. Maxey, Speaker of the House of Representatives of the state of Oklahoma having caused the roll of said House to be called, and ascertaining that a quorum thereof did not appear, and is not present, and having duly received and caused to be entered in the journals of this House a message from the President *pro tempore* of the Senate, advising me, and, through me, the House of Representatives, that a quorum of the said Senate has not appeared, do hereby adjourn said House of Representatives of the Fourth Legislature of the state of Oklahoma without day, and hereby declare the same duly adjourned.'" (House Journal, pp. 1399, 1400.)

That on said day, to wit, July 5, 1913, at 12 o'clock m., the Senate adjourned without day, pursuant to said Concurrent Resolution No. 29, the proceedings being as follows:

"Oklahoma City, Oklahoma, Saturday, July 5, 1913. Senate reconvened at 12 o'clock m., Saturday, July 5th, pursuant to recess, the President *pro tempore,* Kendrick, presiding. On roll call, a total of 7 senators answered, and there were absent and marked absent a total of 33. The journal of the 69th day was approved. There being no quorum present, the President *pro tempore* transmitted to the Speaker of the House a message, informing him that the Senate met at 12 o'clock m., July 5, 1913, pursuant to House Concurrent Resolution No. 29, and only a total number of seven persons answering, and a quorum not being present, the Senate adjourned *sine die.*" (Senate Journal, pp. 1711, 1715, 1716.)

The referee reports that the members of the Senate and House of Representatives received pay from the state of Oklahoma to and including July 5, 1913. He finds that there was no session after the respective adjournments of the two houses, to wit, on June 30 and July 1, 1913, except the session of July 5th, as shown by the journals. He finds, as a matter of fact, that "all of the employees of the House of Representatives, with a few exceptions, were discharged on June 30, 1913; that practically all the members of the House of Representatives settled with the state for the amount due them; dispersed on July 1st and 2d, and went to their respective homes, and that none did return except those shown to be present by the journal of the House on July 5, 1913, and also makes the same finding of fact as to the Senate employees and members, and further concludes and finds that the House of Representatives adjourned on June 30, 1913, and the Senate adjourned on July 1, 1913, if the powers and duties stated in said Concurrent Resolution No. 29 were void; but if they had the authority to pass such a resolution, then he concludes and finds as a fact that the Houses did not adjourn until July 5, 1913."

It is noted that the House Journal (page 1395) fails to show that the Speaker announced an adjournment of the House from June 30 to July 5, 1913, as suggested in the motion of Mr. Riddle. And in effect, there is the same lack of official announcement

by the President *pro tempore* of the Senate, following the motion of Senator Memminger.   Senate Journal, p. 1710.

*Ledbetter, Stuart & Bell, Ames, Chambers, Lowe & Richardson, Asp, Snyder, Owen & Lybrand, Stuart, Cruce & Cruce, Burwell, Crockett & Johnson, Vaught & Ready, Everest, Smith & Campbell, Dorset Carter, Tom McMechan, J. L. Francis,* and *W. F. Harn,* for appellant.

*Hepburn & Chappell, Dale & Bierer,* and *Tibbetts & Green,* for appellees.

*McAdams & Haskell, amici curiae.*

RUSSELL, Special Justice (after stating the facts as above).   In the consideration of the questions presented in this record, we are not unmindful of their importance and the gravity of the consequences to follow whatever conclusion is reached.

The powers of the initiative and the referendum reserved to the people occupy a prominent place in the Constitution and laws of this state, and their act, when invoking such powers, should be guarded by the courts, to the end that whatever is their due is kept inviolate.   In the exercise of such powers, it is necessary that the provisions of the Constitution should be adhered to.

This is an appeal from the decision of the Secretary of State, in which he denied the protest of the appellant against the referendum petition referred to in the statement.   Appellant presents various grounds in his protest, but we deem it only necessary to consider such as are strictly germane to the issue deemed important by us in the disposition of this case.   His twenty-second ground of protest is that:

"Said referendum petition was not filed with the Secretary of State of the state of Oklahoma within ninety (90) days after the final adjournment of the special session of the Fourth Legislature of the state of Oklahoma, which passed said bill sought to be referred by said referendum petition."

Whether or not the petition was filed in time depends upon a decision as to when the Legislature, in fact, finally adjourned.

The Constitution of the state of Oklahoma (section 3, ·art. 5, Williams Ann. Const. Okla. p. 29) is as follows:

"Referendum petitions shall be filed with the Secretary of State not more than ninety days after the final adjournment of the session of the Legislature which passed the bill on which the referendum is demanded.   *   *   *"

We quote only the portion of the section referring to the matter under consideration.

When is a legislative body in session?   When did the session of the Legislature which passed the bill sought to be referred finally adjourn?   It is conceded that the referendum petition was filed with the Secretary of State on the 2d day of October, 1913, and it is not questioned but that the referendum petition, to be filed in time, must be filed within 90 days after the final adjournment of the session of the Legislature which passed the bill on which the referendum is demanded.   If the Legislature adjourned, say, on July 1, 1913, then the constitutional requirement of the time of filing the referendum petition has not been complied with; but if the final adjournment is considered to have taken place on July 5th, then, in such case, the petition was filed within 90 days.

How is this matter to be determined?   How are we to ascertain by the rules of law, aided by the procedure governing legislative bodies, when a final adjournment occurs?   In our opinion, it is proper to inquire into what the Legislature did or attempted to do to bring about adjournment, and in this inquiry we shall not resort to parol evidence, as this would be in violation of the rules of law, but will limit the inquiry to what is. shown by the journals of the two houses, for "each house is required by the Constitution to keep a journal of its proceedings, and, from time to time, publish the same."

It is of primary moment that we refer to what has been mentioned as House Concurrent Resolution No. 29, adopted by the House on June 28th and by the Senate on June 30th, and approved July 10th, as shown in Session Laws 1913, p. 732. This resolution is set forth in the statement.   The substance of its provisions are that each house delegated to each presiding

officer thereof the power to immediately adjourn their respective houses on the 5th day of July, 1913, at 12 o'clock m., if, upon the call of the roll of each house, a quorum should not have appeared, and such adjournment to be without day; the meaning and intent being that, upon the happening of a contingency of no quorum, the presiding officers should adjourn their respective houses without day.

Apropos of this, we call attention to the following provision of the Constitution:

" * * * And a majority of each house shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent members in such manner and under such penalty as each house may provide."

The resolution, while lodging the power with the presiding officers of the respective bodies to adjourn without day, deprives those members who would appear on July 5th, if less than a quorum, of their constitutional prerogative to adjourn from day to day, and to this extent it seems that the delegation of authority to a presiding officer to do an act and denying to a smaller number than a quorum the power of adjourning from day to day is in conflict with the spirit and intent of the Constitution. While we are not aware of any action of the two houses giving authority to a number less than a quorum to compel the attendance of absent members, yet the right of a smaller number than a quorum to adjourn from day to day is unequivocally stated in the Constitution.

It cannot be determined from the resolution whether the contingency provided for ever occurred; that is, whether on July 5th a quorum was or was not present, and, it being silent in this regard, does it not become essential to ascertain from the journals of the two houses the proceedings, if any, germane to and involving an explanation thereof? To do this, it is not necessary to resort to parol evidence as to what the proceedings were, or, as suggested by counsel for appellees, "to inquire of bootblacks and chat in hotel corridors as to when the adjournment took place," but is it not necessary and proper to look to the

proceedings as recorded by the requirements of the Constitution, to inquire as to what was done and how it was done, in the attempt to conform to the delegated powers in the concurrent resolution?

Under the record submitted, it is shown that on June 30, 1913 (House Journal, p. 1433), a motion was made that the Speaker be instructed to adjourn the House until July 5th, under the terms of the concurrent resolution. In Senate Journal, p. 1710, it is shown that on July 1, 1913, on motion, the Senate recessed in accordance with House Concurrent Resolution No. 29, until Saturday, July 5th, at 12 o'clock m. We have carefully examined the journals, and we do not find a record of any declaration or announcement by the presiding officers adjourning the bodies in response to the suggestions contained in said motions, or that the motions were acted upon. From such conditions, it cannot be determined that the houses, in fact, adjourned until July 5th; in other words, that an adjournment took place, carrying them over to July 5th, or such action that would authorize their meeting on July 5th, even though the power to do so was properly delegated by the resolution. To say the least of it, it is a confused condition, and, as heretofore stated, there is nothing in the resolution tending to show that the contingency provided therein ever occurred, and also the absence of anything in the journals showing that the two houses were declared adjourned on June 30th and July 1st, respectively, to July 5th leaves us to conjecture whether the assembling on July 5th was with any semblance of authority; but, without determining the effect of the omissions referred to, we will treat this matter as if there was an attempted adjournment under the terms of the concurrent resolution to July 5th.

Waiving for the moment a further discussion of the questions involved, we will state briefly the action of the two houses on July 5th, and, in reviewing this matter, we do not deem it necessary to consider the action, or the effect thereof, of the presiding officers in settling with and discharging the employees, or that practically all the members of both houses left the legislative halls on June 30th and July 1st, respectively, and did not

return to perform any of the duties devolving upon them as members thereof, as this latter feature does not enter into our conclusions. The journals of either house do not show any proceedings in the intervening days from, say, July 1st to July 5th, and there is no pretense of a legislative session of either house during those intervening days. As is stated, the Constitution requires that each house shall keep a journal of its proceedings and publish them.

"The proceedings, then, constitute the journals; one can have no existence without the other, and, in the absence of both, there can be no houses. The journals must show proceedings to establish a legislative session." (*People v. Hatch,* 33 Ill. loc. cit. 156.)

By House Journal, p. 1396, it is shown that on July 5, 1913, at 12 o'clock m., the Speaker presiding, the roll was called and a total of eight members, including the Speaker, answered, and immediately such information was communicated to the President *pro tem.* of the Senate, certifying to him that a quorum of the House had not appeared.

By Senate Journal, p. 1711, it is shown that on July 5, 1913, at 12 o'clock m., the President *pro tem.* presiding, the roll of the Senate was called and a total of six members, including the President *pro tem.,* answered, and immediately such information was communicated to the Speaker of the House, that a quorum of the Senate had not appeared.

We are further advised by the House and Senate Journals that the presiding officers of each body, having had the roll of their respective houses called, and ascertaining that a quorum did not appear and were not present, did declare the respective houses adjourned without day.

The objections of appellees are: First. That the court cannot go behind the concurrent resolution for the purpose of inquiring whether the Legislature actually dispersed at a date prior to July 5, 1913, the date named in said resolution. Second. That the court cannot consider evidence tending to impeach such concurrent resolution, or tending to impeach the journals of the House and Senate, nor inquire into the motives of the

Legislature in passing such resolution, or making such journal entries. These two propositions present the gravamen of the complaint by appellees in the matter treated.

We answer that the concurrent resolution was adopted by the House on the 28th day of June, and by the Senate on the 30th day of June, and we are not looking to what occurred prior to the adoption of the resolution; therefore, in the language of counsel for appellees, we are going "behind" the resolution, but are inspecting the proceedings, as shown by the journals of the two houses, subsequent to the adoption of the resolution, in order to understand therefrom what was, or was not, done, or whether the action of the two houses was such, evidenced by the proceedings, as would enable an understanding of the resolution. Hence we say we are not in conflict with the rule stated in *Marshall Field v. Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, and which has also been announced in *A., T. & S. F. Ry. Co. v. State,* 28 Okla. 94, 113 Pac. 921, 40 L. R. A. (N. S.) 1.

The resolution is not self-executing or self-explanatory, hence there exists a legal compulsion that its terms, providing for the contingency mentioned, be understood. By its terms, if on July 5th a quorum is not present, the presiding officers shall immediately adjourn their respective houses without day. Without invoking the aid of the journals, how is it possible to determine this matter, they being a part and parcel of whatever is intended by the concurrent resolution?

We have already stated the action of the Houses on June 30th and July 1st, respectively. This is shown by the journals, and not by any attempt at parol or other like evidence. If there was no session of the Legislature in legal contemplation subsequent to July 1st, then it follows that there was a final adjournment on that day.

There is no effort to impeach the concurrent resolution, only to question the powers sought to be delegated by it; nor is there any effort tending to impeach the journals of the two houses, nor to inquire into the motives of the Legislature in mak-

ing such resolution. As stated, we simply go to the journals—the proceedings of the two houses—in an effort to ascertain what was, or was not, done. If by the journals it can be determined whether there was a session or no session, as is contemplated and required by the law, then, in our judgment, we have reached a finality of the question at issue.

The two propositions of· appellees suggest principles or rules of law which may or may not be applicable under a given case stated, but we do not think they apply to the condition of affairs disclosed by this record, and we mean by the record the proceedings of the two houses. Parol or other such extrinsic evidence is not appealed to or allowed to impeach the journals or acts of the Legislature. Nor is there any attempt made to use the journals to impeach an act of the Legislature.

The Constitution, sec. 3, art. 5 (*supra*), requires the petition to be filed not more than 90 days after the final adjournment of the session. It therefore becomes necessary to determine the meaning ascribed by the law-writers and lexicographers to the word "session."

"Session," as defined in Abbott's Law Dictionary, is:

"A sitting; sometimes used for the time during· which any body of persons or tribunal is organized, competent for transaction of its business; in other connections, the time during which it is convened and actually engaged in business. * * *"

We conclude that it must be such a sitting or session, according to this authority, as is competent for the transaction of business. Under the Constitution of Oklahoma, it requires a majority of each house to do business, and as a necessary corollary, it cannot be termed a session in the absence of a sufficient number to do business. In other words, a minority of either house cannot transact business, and this view is in keeping with the provision of the Constitution permitting a smaller number than a quorum to adjourn from day to day merely.

Black's Law Dictionary gives this definition of a "session": "The sitting of a court, legislature, council, commission, etc., for the transaction of its proper business. * * *"

Mr. Bouvier, in defining "session," says:

"The time during which a legislative body, a court, or other assembly, sits for the transaction of business; as a session of Congress, etc., etc." (*People ex rel. v. Aud. Pub. Acc'ts*, 64 Ill. 86.)

The Ency. of Plead. & Prac. vol. 21, pp. 559, 560, says: "A session of court is the time during a term in which the court sits for the transaction of business."

The Century Dictionary includes the following among the word's (session) meaning:

"The sitting together of a body of individuals for the transaction of business; the sitting of a court, academic body, council, legislature, etc., or the actual assembly of the members of these, or any smaller body, for the transaction of business; as, the court is now in session (that is, the members are assembled for business); the time, space or term during which a court, council, legislature or the like, meets daily for business, or transacts business regularly, without breaking up.  *  *  *"

The word "session" as used in the Constitution of Minnesota, art. 4, sec. 11, providing that "Within three days after the adjournment of the Legislature, the Governor may approve, sign and file in the office of the Secretary of State any act passed during the last three days of the session," means the actual assemblage of the Legislature for business. *Farwell Co. v. Matheis* (C. C.) 48 Fed. 363, 364. It is held in that case, in speaking of the word "session," that:

"The prime definition of this word, when applied to a legislative body, is the actual sitting of the members of such body for the transaction of business."

It is held in *People v. Fancher*, 50 N. Y. loc. cit. 294, that:

"The session of the Senate, like the sessions of the Legislature or of Congress, or the term of a court, continues, notwithstanding repeated recesses or adjournments, until the final close or end in some way provided by law. It is true that should the Senate not come together pursuant to the adjournment, and so the session fail (and that that will not be the case cannot now certainly be known), the question will arise whether the session did not, in fact, terminate on the 10th day of September, the day of the last adjournment."

If it is not a Senate or a legislative body without the presence of a quorum, does not the question arise in this case whether

the session did not, in fact, terminate on the 1st day of July, the day of the last adjournment, as there was no coming together afterwards? It seems to us to be the inevitable conclusion reached by all the authorities at our command, and the reasoning given by them induces a similar conclusion on our part, that a legislative body is in session only when it is prepared to transact business. The criterion is, not that there is business to be done, but it is, Is there a constitutional quorum, competent to transact business? In support of this, we can invoke the rule that applies to and defines sessions of a court. How can there be such a thing as a constructive session of a court, or a constructive session of the Legislature? What is required to have a session of the Legislature, if not a quorum of its bodies? What is required to have a session of the court, if not the presence of the judge?

In the case of *Delafield et al. v. Louis Mercer Const. Co. et al.*, 115 N. C. 21, 20 S. E. 167, it is held: "There is no court when there is no judge to hold it, and there can be no constructive session after he has left."

In the case of *Wight v. Wallbaum et al.*, 39 Ill. 554, where the question involved was when a term of court adjourned, the court was in session on August 23d, on which date it adjourned until the next day, and the judge not returning the next day, the sheriff and clerk met and adjourned the court from day to day. The term of the court at which the judge thus absented himself lasted until some time in September, but, the judge not returning after the 23d of August, it was held in that case that the adjournments by the clerk and sheriff were invalid, and that the adjournment of the court became final on the 23d, although, in that case, the judge himself had adjourned the court until the 24th, the day following his absence. The court says:

"After the 23d, for the want of a judge, no legal business could have been transacted, and for that reason the court stood adjourned. The judge who opened the court might, no doubt, have adjourned to a specified day, had the business of the court required it, and business might have been regularly resumed at that time. The judge had no power to authorize the ministerial officers of the court to exercise judicial powers, even in open-

ing and adjourning the court. They not having such authority, and the court not having been opened on the 24th by a judge authorized to exercise the jurisdiction of the court, it stood adjourned after the 23d, and that must be regarded as the last day of the term."

In that case, the judge, being on the bench on August 23d, adjourned the court until the next day, and he not returning during the remainder of the term, it was held that the session ended on the 23d, and for two reasons—it required the presence of the judge to transact business, and there could not be delegated to the ministerial officers of the court the power to adjourn it from day to day.

Under the statutes of Oklahoma, the sheriff is authorized, in the absence of the judge on the first and second days of the beginning of the term, to adjourn the court until the third day thereof, at which time, a judge not appearing, the term lapses.

After the 1st day of July, 1913, there was no reassembling of the Legislature. Like the judge, it did not return. There was no session without its presence. It is true that a small number of each house, being a small per cent. thereof, met, and we are authorized to infer that those who did meet met with the pre-existing knowledge that a quorum would not be present, and, since the concurrent resolution undertook to delegate to the presiding officer of each house the power to meet and adjourn on the 5th day of July, we do not understand the necessity existing for seven others of the lower house and five others of the Senate to appear. The thing that was to be done was confided alone to the presiding officers, without any right or power upon the part of any others who might be present, less than a quorum, to even object or to urge a going over from day to day. Under our Constitution, the presiding officer of each house is a member of such body. He is simply one personage; and yet it is insisted that these two persons can be vested with legislative power, with the transaction of business, with the adjournment *sine die,* which, in itself, is a transaction of most important business, because from that date hinges much that is important in the perfecting of legislation or carrying into effect acts of the Legislature and duties devolving upon the Governor.

Ralls v. Wyand et al.

.· If a minority, acting under the concurrent resolution (and the Speaker is certainly a minority), can adjourn the House *sine die*, why cannot any other minority, in order to block legislation and disrupt a session, meet before a quorum can assemble and adjourn the body *sine die?* If the concurrent resolution could delegate to the presiding officers the authority to meet on a certain day, call the roll, and, no quorum answering, to adjourn the body *sine die*, why cannot he be delegated to transact other business, and thus save the expense and inconvenience of an organized assembly? In the language of Mr. Justice Breese, we ask:

"Can it be that, by a legal fiction, the Legislature will be deemed in session, when, in fact, there is no such organized or assembled body?"

How can a body be in session when it is not in session? Is the matter of session a fiction of the law and a semblance of duty done or discharged when there is no one present to do the duty, or even present to perfect or suggest what should or should not be done?

When the two houses closed their sessions on June 30th and July 1st, respectively, it was clearly the intention not to return for any further session. We think the concurrent resolution definitely states the purpose of both houses not to reassemble on the 5th day of July, and there being no appearance of any members for any purpose in the intervening days and their failure to appear on the 5th leads inevitably to the conclusion that the Legislature meant by such resolution to do exactly what it did, adjourn on July 1st, at latest. The purpose not to return is made manifest by the fact that they did not return, and it likewise supports the conclusion that they did not intend to return, but, as a matter of fact, regarded the session of June 30th and July 1st as a termination of the extraordinary session of the Legislature. The resolution shows the purpose to disperse; the journals evidence the fact there was no other meetings (as what is called a meeting on July 5th cannot be regarded as a session or meeting of the Legislature), and there being a dispersal of the two bodies, as heretofore stated, such act, under this record, constituted a final adjournment, and by

such act all claim as a legislative body was relinquished, and, being relinquished, constituted an end to the session, for "a legislative body has adjourned when it has dispersed."

At the risk of being tedious or of repeating, and as a *resume* of what has been said, in conclusion, we are impressed with the correctness of the proposition that when a Legislature is in session its acts speak through its journals. If its journals are silent, there is no session, and there can be no such session as is contemplated by the law and common sense, unless there be a sufficient number to transact business. A dispersal of a body ends its life, and it cannot be kept alive by any such delegation of authority. The same principle controls this reasoning as applied to a court. If the judge of a court, during a term thereof, vacates the bench and his district and his duties, he cannot keep alive the term. The last day of his sitting and transacting business is the end. He, in person, must adjourn that court to a given day of that term, and he cannot delegate the authority to some one else to keep alive the term of the court. It must be an act of the court that preserves the life of the term, and not a delegated act. It must be an act of the Legislature, acting through a quorum of each house, to adjourn for a longer term than three days. It must be an adjournment that, upon its re-assembling, there is a continuity in the purpose and in the act which, in itself, shows a continued existence of session. There was a dispersal; there was no re-assembling; there is no continuity in the purpose to discharge duties; and, such being the case, the session terminated by the dispersal.

The minority on the 5th day of July, 1913, undertook, by an unwarranted act, to give life and validity to the effect of a body that was *functus officio*. We are forced to the conclusion that the 30th day of June was the end of the session of the House, and that the 1st day of July was the end of the session of the Senate, and, at best, there was no session of the Legislature of Oklahoma after the 1st day of July. We therefore hold that there was a final adjournment of the special session of the Fourth Legislature of the state of Oklahoma, which passed the bill sought to be referred by said Referendum Petition No. 28, State Ques-

tion No. 65, at latest, on July 1, 1913; that said referendum petition, filed on October 2, 1913, with the Secretary of State, was not filed within 90 days after the final adjournment of the session of the Legislature, as required by the Constitution; and we further hold that the protest of appellant that said referendum petition was not filed with the Secretary of State in the time required by the Constitution of Oklahoma was well taken, and that no election can be held upon said referendum petition, and that said House Bill No. 72 remains in force and effect.

The conclusion we have reached upon the point discussed eliminates all other questions presented in the record and renders a reference to them unnecessary.

The judgment of the court therefore is that the petition for referring said act is void, for the reason that the same was not filed with the Secretary of State within the time required by the Constitution, and that the protest filed against said petition be and the same is hereby sustained.

HAYES, C. J., and TURNER and LOOFBOURROW, JJ., and ROBERTSON, Special Justice, concur.