THE STATE OF DELAWARE, EX REL. JOHN BIGGS, JR., *v.* ROY F. CORLEY, LIEUTENANT-GOVERNOR.

(*April* 3, 1934.)

LAYTON, C. J., HARRINGTON, RICHARDS, RODNEY and REINHARDT, J. J., sitting.

*Charles Stewart Lynch* and *Howard E. Lynch, Jr.*, for relator.

*Percy Warren Green*, Attorney-General, for defendant.

Court in Banc.

Layton, C. J., delivering the opinion of the Court:

██ One of the questions presented for determination is concerned with the status of the relator, who, as a citizen and taxpayer, has instituted these proceedings. They involve questions of public rights and duties. The object and purpose of the writs of mandamus are to procure the enforcement of public duties. No special interest in the result of the proceedings need be shown. It is sufficient that the relator is a citizen and, as such, interested in the enforcement of the laws. While a senator must be elected from a particular district, yet, upon his election and qualification he becomes a senator of the State of Delaware, and his acts, as such, affect the entire state.

██ These proceedings, undoubtedly, could have been instituted by the Attorney-General, or, with his consent, in his name; but a person whose only interest is that of a citizen and taxpayer of this state, also may bring such proceedings in the name of the state upon his own relation; and especially is this true where the Attorney-General appears for the state officer against whom the writs are sought and opposes their issuance. *Hawkins v. Dougherty,* 9 *Houst.* 156, 18 *A.* 951; 18 *R. C. L.* 325; 38 *C. J.* 839-846.

██ Another question presented and argued extensively is supposed to require a construction of *Section* 6, *Art.* 2, of the *Constitution,* the precise question being concerned with the meaning of the word "session" appearing in this section. For the defendant it is contended that the first sentence of the section must be construed and read as though the phrase "being in session," or phrase of similar import, actually were inserted, and, therefore, the duty of

the presiding officer of a house of the legislature to issue a writ of election arises only when the General Assembly is in actual session. Consequently, the Senate not being in actual session at the time the petitions for the writs were filed, no duty was cast upon the defendant, as presiding officer of that body. For the relator it is argued that the word "session" means the period of time from the convening of the Legislature in special session until its final adjournment; therefore, the Legislature, not having finally adjourned, it was the duty of the defendant to issue the writs of election. Authorities having to do with these contentions are for the defendant, *People v. Fancher,* 50 *N. Y.* 288; *U. S. v. Dietrich* (*C. C.*), 126 *F.* 659; *Ralls v. Wyand,* 40 *Okl.* 323, 138 *P.* 158; *State v. Strange,* 50 *Wash.* 321, 97 *P.* 233; *Com. v. Gove,* 151 *Mass.* 392, 24 *N. E.* 211; and for the relator, *Ravenscraft v. Com'rs,* 5 *Idaho* 178, 47 *P.* 942; *People v. Auditor,* 64 *Ill.* 82; *Emerson v. Rwy. Co.,* 37 *Tex. Civ. App.* 110, 82 *S. W.* 1060; *Williams v. Nashville,* 89 *Tenn.* 487, 15 *S. W.* 364.

It is not necessary to consider and determine the precise question presented and argued. The scope and meaning of the words "in session" are of incidental importance only. The underlying question is deeper and of far more importance, and does not depend upon a technical construction to be given to the words "in session." The real question is whether the presiding officer of either house of the Legislature possesses, under the constitution, any power or authority to issue a writ of election to fill a vacancy in the absence of an order or direction of the house requiring him so to do, or, as here, in despite of a determination by the senate that no vacancy exists. If the presiding officer has no such power and authority it is apparent that the first sentence of the section does not require a construction which would necessitate the interpolation of a phrase such as, "being in session."

The principle of construction is that, to ascertain the

true intent and meaning of any particular provision of a constitution, it is the duty of the court to consider the whole instrument. 6 *R. C. L.* 47. *Section* 6, *Art.* 2, having to do with the filling of vacancies in the houses of the Legislature, must be read in connection with the first clause of *Section* 8 of the same article, providing that "each House shall be the judge of the elections, returns and qualifications of its own members."

It is essential that there should exist somewhere the power to take the necessary steps to fill vacancies occurring in a legislative body. In England the House of Commons has always regarded the right of determining upon the existence of vacancies among its members and of taking measures to fill them, as essential to its free and independent existence. When the House of Commons, acting in its judicial capacity, instituting a previous inquiry where the law or fact is doubtful, but proceeding at once if no question is raised as to either, has determined that a vacancy exists, the Speaker, by order of the House, sends his warrant to the Clerk of the Crown in Chancery directing an election. This mode of proceeding cannot, of course, take place at any other time than during a session. When vacancies occur during a recess, the Speaker is authorized by statute 24 *Geo. III, Ch.* 26, 1784, to issue his warrant for a new election upon the existence of a vacancy being certified by two of the members and upon publication of notice, but the vacancies which may be thus filled are those only which are occasioned by death, bankruptcy or elevation to the peerage. *Cushing's Law and Practice in Legislative Assemblies, Secs.* 452-457. As the House of Commons, in England, always exercised the right to direct its speaker to issue a writ of election, so also did the House of Assembly under the Delaware Constitution of 1776. By the fifth article of that Constitution it was provided that "each house shall choose its own speaker, * * * judge of the qualifications and elections of its own members * * * and

airect writs of election for supplying intermediate vacancies." The Constitution of 1792 omits the express right of the house, and provides that the Speaker shall issue the writ (*Article* 2, § 13), but this simply designates the person by whom the writ is to be issued. The underlying principle is that where a vacancy exists in a house of the Legislature, the house alone can declare it and order it to be filled during the session of the house. The presiding officer of the house has no power or authority as such to determine anything with respect to a vacancy. His eyes and ears and hands are those of the house. He carries forward that which the house determines. It would be intolerable that the presiding officer of a house should have the power to issue a writ of election against the will of the house, or refuse to issue such writ in defiance of its will. A house of the Legislature speaks through its journals. If there is no session there can be no journal. Consequently where there is no session there can be no order or direction to the Speaker to issue a writ of election, and without this the presiding officer is without power or authority.

But, it may happen, as here, that the General Assembly is not in session, and circumstances may arise from which a vacancy is supposed to occur. By *Vol.* 6, *Del. Laws,* 410 (*Code* 1829, 184, title *General Elections*), it was provided that writs of election might be issued by the Speaker of either House after adjournment of the General Assembly. But by the Constitution of 1831 (*Article* 2, § 3) the Governor was given the power to issue writs of election to supply vacancies in either house of the General Assembly that have happened·or may happen, but clearly it was not meant by this to take from the house the right to judge of the qualifications of its own members, and the existence of a vacancy was left to be determined by the house when the person elected pursuant to the writ issued by the Governor presented his credentials to the house. The Governor, from the first and now, is given a permissive power.

He is not commanded to issue a writ of election and could not be compelled so to do. Where the vacancy is caused by death, the Governor would proceed to issue the writ; but where the vacancy is a matter of judicial inquiry and decision, where the validity of his decision to issue a writ of election and the election thus held is to be determined finally by the house in which the vacancy is supposed to exist, undoubtedly the Governor would decline to trespass upon or otherwise to interfere with a prerogative of a house of the Legislature.

The Lieutenant-Governor is designated as President of the Senate. He presides over the Senate, but provision is made for his absence and the Senate is required to choose one of its own members president *pro tempore* who shall preside in the absence of the Lieutenant-Governor. The Lieutenant-Governor is not a member of the Senate. He has no vote except in the case of a tie vote. It would be insufferable and destructive of the freedom and independence of the Senate if its presiding officer under the Constitution should arrogate to himself a power and authority to declare a vacancy, against the will and determination of the Senate itself, or should refuse to obey the direction and order of the Senate. If the presiding officer of the Senate should refuse to issue a writ of election when directed so to do undoubtedly a writ of mandamus would lie against him, for in such case the courts would be carrying forward the constitutional power of that body; but where the Senate has not determined that a vacancy exists, or where, as here, it has resolved that no vacancy exists, the Lieutenant-Governor, as presiding officer, has no right, power or authority in the premises, and, consequently, a writ of mandamus to compel him to issue a writ of election will not lie against him. For this reason the petitions must be dismissed.

Having decided that the writs do not lie against the Lieutenant-Governor, in some sense, it would be unnecessary to consider and decide other questions presented, but

as they are of great public interest and importance, we are of the opinion that we should not decline to express our views.

The first of the questions arises under *Section 14, Art. 2, of the Constitution.*

In England, prior to our separation from that country, dual office holding was permissable, subject, however, to the limitation that the offices should not be inconsistent or incompatible, as, for instance, Mayor and Town Clerk, or justice of a district court and deputy sheriff. *Throop on Public Offices,* § 30; *Rex v. Jones,* 1 *Barn. & Ad.* 677; *Rex v. Tizzard,* 9 *Barn. & Cress.* 418; *State v. Goff,* 15 *R. I.* 505, 9 *A.* 226, 2 *Am. St. Rep.* 921; 3 *Bac. Albidg. Tit. Officers,* 315; 86 *Am. St. Rep.* 580. But incompatibility may be declared by statutory or constitutional enactment, and from our first constitution, in one form or another, with respect to members of the Legislature, dual office holding has been prohibited. See *Const.* 1776, *Art.* 18. From the beginning of our constitutional history, our state government has been divided into the three great departments, legislative, executive and judicial, and to preserve the freedom and independence of each, and to take care that those chosen to represent the people in the Legislature should be representatives and nothing more, it is provided that no person holding any office under this state shall during his continuance in office be a senator or representative.

 It is sometimes difficult to determine whether a position is an office or a mere employment. Generally speaking, and each case must necessarily depend upon its own facts, a state office embraces the right to exercise a state function or employment, and to take the fees and emoluments belonging thereto. It not only involves the conception of tenure, power, duration, oath, fees and emoluments but also the authority and duty to exercise some part of the sovereign power of the state either in making, administer-

ing or executing the laws of the state. 22 *R. C. L.* 374; 46 *C. J.* 927 *et seq.; Note* 63, *Am. St. Rep.* 182; *U. S. v. Hartwell,* 6 *Wall.* 385, 18 *L. Ed.* 830; *Atty. Gen. v. Drohan,* 169 *Mass.* 534, 48 *N. E.* 279, 61 *Am. St. Rep.* 301.

■ Applying these tests to the offices in question, it is apparent that the office of member of the Board of Fish and Game Commissioners (*Revised Code* 1915, § 2358), is an office under this state. This office has term, salary and expenses. Bond and oath of office are required (*Section* 2359). The Board has the management of all matters relating to the protection of game and fish. It appoints wardens and other officers, issues licenses for hunting and fishing, and the members have authority to arrest without warrant for all violators of the game and fish laws.

■ Likewise, the office of Collector of State Revenue (*Revised Code* 1915, § 275) is an office under this state. The term is four years. The salary is not unsubstantial, and a contingent fund for his expenses is provided. His duty is to investigate statements and returns filed by persons, firms and corporations which furnish a basis for the determination of license fees.

■ The office of Secretary of the State Board of Charities (*Chapter* 64, *Vol.* 30, *Laws of Del.*) is not an office under this state. This position has no term. The statute requires no bond, and no powers and duties are placed upon the holder. The duties are secretarial, and are such as the Board may direct him to perform. It is apparent that the position is an uncertain and indefinite employment by a state board, and though the duties are of a public or quasi public nature, it is not·an office.

■ But the office of Notary Public is of ancient origin, and has long been known to the commercial world. It was classed as a public office at common law, and is generally held to be a public office although the duties largely

relate to the authentication of documents. 46 *C. J.* 501 *et seq.* Therefore, we are compelled to hold that the office of Notary Public is an office under this state.

■ It is a general principle of law that where the holder of an office accepts another incompatible office, the acceptance of the second office operates as a resignation or renunciation of the first as fully and effectually as though the relinquishment of the first office had been an intentional and voluntary act. *Throop, Public Offices,* §§ 30, 51; *Mechem, Public Offices,* § 420; *Rex v. Patterson,* 4 *Barn. & Ad.* 9. And the same principle applies where the incompatibility is declared by constitutional provisions similar to *Section* 14, *Art.* 2, of our *Constitution. People v. Haas,* 145 *Ill. App.* 283; *Lodge v. Farrell,* 155 *Mich.* 426, 119 *N. W.* 573; *State ex rel. Leland v. Mason,* 61 *Ohio St.* 513, 56 *N. E.* 468; *State v. Sadler,* 25 *Nev.* 131, 58 *P.* 284, 59 *P.* 546, 63 *P.* 128, 83 *Am. St. Rep.* 573; *In re Advisory Opinion,* 76 *Fla.* 417, 79 *So.* 874; *State v. Nye,* 148 *Wis.* 659, 135 *N. W.* 126; *State ex rel. Owens v. Draper,* 45 *Mo.* 355; *Meagher v. Howell,* 171 *Ky.* 238, 188 *S. W.* 373. See, also, *Scott v. Strobach,* 49 *Ala.* 477; 86 *Am. St. Rep.* 583, *Note.*

■ And, when the resignation has become effective by the acceptance of the incompatible office, a resignation of the second office does not revive or restore the right to hold the first office which has thus been abandoned or resigned. *Relender v. State ex rel. Utz,* 149 *Ind.* 283, 49 *N. E.* 30; *Bishop v. State,* 149 *Ind.* 223, 48 *N. E.* 1038, 39 *L. R. A.* 278, 63 *Am. St. Rep.* 270; *State ex rel Birkhauser v. Moores,* 52 *Neb.* 634, 72 *N. W.* 1056; *State v. Goff,* 15 *R. I.* 508, 9 *A.* 226, 2 *Am. St. Rep.* 921; *State ex rel Walker v. Bus,* 135 *Mo.* 325, 36 *S. W.* 636, 638, 33 *L. R. A.* 616; *Com. v. Sherrard,* 4 *Leigh* (*Va.*) 643; *State v. Fitts,* 49 *Ala.* 402.

■ When a question involving an implied resignation of one office (it not being that of a member of a legislature), by the acceptance of another office, is pre-

sented to the courts for decision, the courts have jurisdiction in the full and complete sense of having power and authority to decide and to enforce the execution of what is decreed, and no difficulty arises. But, when the first office is that of a representative or senator in the General Assembly, and the question arises whether the acceptance of another office operates as an implied resignation of the first, the principle of resignation or abandonment remains the same, and should be adhered to and enforced, and we may not assume that the officials of the state under their oaths of office will repudiate knowingly this constitutional prohibition; but the Courts, ordinarily constituted, may not proceed to hear and adjudicate, for they are not the tribunals provided by the Constitution for the determination of such question. They have no jurisdiction for the reason that another and different tribunal possesses the sole jurisdiction, that is, the senate or the house as the case may be, under that provision of the Constitution which gives to each house of the Legislature the right, power and authority to judge of the elections, returns and qualifications of its own members. This is necessarily so, for the power and authority must reside somewhere, the departments of government must be separate and distinct, free and independent, and, while the courts will jealously guard its powers and jurisdictions, they will be careful not to infringe upon the powers, prerogatives and jurisdictions of the legislative department. *Ex parte Echols*, 39 *Ala.* 698, 88 *Am. Dec.* 749.

Judge Story in his work on the *Constitution* (2d Ed.), *Vol.* 1, § 833, says:

"The only possible question on such a subject is, as to the body, in which such a power shall be lodged. If lodged in any other, than the legislative body itself, its independence, its purity, and even its existence and action may be destroyed, or put into imminent danger. No other body, but itself, can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights and sustain the free choice of its constituents. Accordingly, the power

has always been lodged in the legislative body by the uniform practice of England and America."

We quote at length from the opinions of two eminent judges, one of Judge Cooley, the other of Judge Brewer. In these opinions may be found the principles by which courts are bound when questions like the one presented here arise, and the reasons therefor. The limitation of space forbids a more extensive quotation from the decisions.

In *People ex rel. Drake v. Mahaney,* 13 *Mich.* 481, decided by Judge Cooley in 1865, the question of the qualifications of members of the House of Representatives arose with respect to the Soldier's vote cast out of the State in 1864, and the composition of the House as produced thereby: Nine members of the House, not having been elected except by the Soldier's vote, were admitted as members. Subsequently, the Soldier's Vote Act was declared unconstitutional and void, but the nine members continued to serve and were declared eligible by the House. It was contended that the nine members had no right to their seats, and, therefore, that a certain statute which required a two-thirds vote in order to make it effective immediately, under the Michigan Constitution, did not take immediate effect as it had not received the necessary vote. Judge Cooley said:

"It is insisted by respondent's counsel that, although *Section* 9 of *Article* 4 of the *Constitution* authorizes each house to 'judge of the qualifications, elections and returns of its members,' yet it does not do more than to empower them to determine, First, whether the returns or certificates of election are in form and substance in conformity with the law; Second, whether a man who presents himself for membership possesses the requisite qualifications; and, Third, whether, at a proper election, he has received a majority of legal votes cast under the law. And in passing upon these questions, it is said they do not act in a judicial capacity to determine what the law is, since the judicial power by *Section* 1 of *Article* 6 (*Const.*) is vested in certain Courts and officers; but they sit under the law to apply it, as judicially expounded, to the facts before them.

"It is a sufficient answer to this argument, that while the constitution has conferred the general judicial power of the State upon the Courts and officers specified, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other bodies or officers; and among them is the power to judge of

the qualifications, elections and returns of members of the Legislature. The terms employed clearly show that each house, in deciding, acts in a judicial capacity, and there is no clause in the constitution which empowers this, or any other Court, to review their action. The 'general superintending control' which the Supreme Court possesses under *Section* 3 of *Article* 6 of the *Constitution*, 'over all inferior courts,' does not extend to the judicial action of the legislative houses in the cases where it has been deemed necessary to confer judicial powers upon them with a view to enable them to perfect their organization and perform their legislative duties. The houses are not 'inferior Courts,' in the sense of the constitution, but, as legislative organizations, are vested with certain powers of final decision, for reasons which are clearly imperative.

"It may happen, as suggested in the argument, that with each house, not only deciding for itself questions of fact, but also construing for itself the law, we may sometimes witness the extraordinary spectacle of the two bodies construing and enforcing the law differently, while a third construction is enforced by the Courts upon the public at large. But with this possibility in view, the evils of allowing the Courts a supervisory power over the decisions of the houses upon the admission of members, are so great and so obvious that it is not surprising that the framers of the constitution refrained from conferring the power. The supervision could not ordinarily be exercised during the session of the legislative body, and to correct the decisions afterwards by amending the laws passed, would only be to substitute a great public evil for that which might have been a wrong to an individual member and to the district which elected him, but which could seldom affect the State at large.

"It can make no difference that in this case, according to the pleas, the question passed upon by the house was purely a question of law. The question of the legal election of a member is usually a question compounded of law and fact, and the house must necessarily pass upon both. If we have the power to review the decision in one case, we have in all. If we can correct their erroneous construction of a law, we have the same power to correct any erroneous decision upon returns, qualifications or majorities. It is sufficient for us to say that the constitution has not conferred upon us this jurisdiction, and whether the decision made is right or wrong, we shall leave it where it has been left by the fundamental law of the State."

In *State ex rel. Martin v. Gilmore*, 20 *Kan.* 551, 27 *Am. Rep.* 189, the opinion was delivered by Judge Brewer, afterwards an associate justice of the Supreme Court of the United States. Under a statute of Kansas any state officer (for whose removal from office by impeachment there was no provision) was deemed to have forfeited his office, who should be intoxicated in any public place. Gilmore was a member of the lower house of the Legislature. The relator brought his action alleging that the defendant

was guilty of "being in a state of intoxication produced by strong drink voluntarily taken." In upholding the lower Court sustaining a demurrer filed by the defendant, Judge Brewer said:

"The constitution declares, *Article* 2, *Section* 8, that 'Each house shall be judge of the elections, returns, and qualifications of its own members.' This is a grant of power, and constitutes each house the ultimate tribunal as to the qualifications of its own members. The two houses acting conjointly do not decide. Each house acts for itself, and by itself; and from its decision there is no appeal, not even to the two houses. And this power is not exhausted when once it has been exercised, and a member admitted to his seat. It is a continuous power, and runs through the entire term. At any time, and at all times during the term of office, each house is empowered to pass upon the present qualifications of its own members. By *Section* 5 of the same article, acceptance of a federal office vacates a member's seat. He ceases to be qualified, and of this the house is the judge. If it ousts a member on the claim that he has accepted a federal office, no court or other tribunal can reinstate him. If it refuses to oust a member, his seat is beyond judicial challenge. This grant of power is, in its very nature (and so as to any other disqualification), exclusive; and it is necessary to preserve the entire independence of the two houses. Being a power exclusively vested in it, it cannot be granted away or transferred to any other tribunal or officer. It may appoint a committee to examine and report, but the decision must be by the house itself. It, and it alone, can remove. Perhaps also, it might delegate to a judge or other officer outside its own body power to examine and report upon the qualifications of one of its members. But neither it, nor the two houses together, can abridge the power vested in each house separately of a final decision as to the qualifications of one of its members, or transfer that power to any other tribunal or officer. And an act which purported to grant to the district court power to remove from office, must be construed as not embracing members of the Legislature; or if its language specifically names, or necessarily includes them, then as to them the act is unconstitutional."

See, also, *Dinan v. Swig,* 223 *Mass.* 516, 112 *N. E.* 91; *Covington v. Buffet,* 90 *Md.* 569, 45 *A.* 204, 47 *L. R. A.* 622; *State v. District Court of Montana,* 50 *Mont.* 134, 145 *P.* 721; *Opinion of the Justices,* 56 *N. H.* 570; *State v. Porter,* 55 *Mont.* 471, 178 *P.* 832; *Mills v. Newell,* 30 *Colo.* 377, 70 *P.* 405; *French v. Senate of California,* 146 *Cal.* 604, 80 *P.* 1031, 69 *L. R. A.* 556, 2 *Ann. Cas.* 756; *Hiss v. Bartlett,* 3 *Gray (Mass.)* 468, 63 *Am. Dec.* 768; *People v. Hall,* 80 *N. Y.* 117; *Auditor v. Supervisors,* 89 *Mich.* 589, 51 *N. W.*

483, 497; *Bingham v. Jewett*, 66 *N. H.* 382, 29 *A.* 694; *Com. v. Allen*, 70 *Pa.* 465; *Note*, 16 *Am. St. Rep.* 220; *State v. Jarrett*, 17 *Md.* 309; 1 *Kent Comm.* 235; 25 *R. C. L.* 378; 59 *C. J.* 85.

The relator seeks to avoid the force and effect of these authorities by asserting that the question before the Court is not one of qualifications, but whether the persons here are or are not members of the Legislature. This argument is not new. It begs the question. It would compel us to decide a question which we have no right to decide for the reason that we have neither jurisdiction to determine nor power to enforce a judgment based upon such determination. It is admitted that a house of the Legislature is the ultimate judge of the right of a person to a seat therein, and, as said by Judge Agnew in *Com. v. Allen, supra,* "It would ill become a court of justice to attempt to displace a member of Assembly. Its desertion of its appointed orbit would be followed by such a display of incompetency to effect its purpose as would be its most signal rebuke."

Of the authorities cited by the relator in support of his position, none assumes to hold that a house of a Legislature may not itself determine finally and conclusively the right of a person to a seat therein. The right to admit, to maintain and to reject is not denied. Thus, in *Scott v. Strobach*, 49 *Ala.* 477, the question was whether a member of the Legislature was eligible to election to the office of Sheriff. The court decided that he was, saying that the acceptance of the office of Sheriff operated as an implied resignation of his seat in the Legislature, but distinctly said that the courts are powerless to enforce such resignation. In *State ex rel. Leland v. Mason*, 61 *Ohio St.* 513, 56 *N. E.* 468, the court refused to issue a writ of mandamus to compel the payment of salary to a member of the Legislature who had accepted a Federal judgeship on the ground that, upon his acceptance of the latter office, he was no longer eligible to a seat in the General Assembly. *People*

152

*v. Haas*, 145 *Ill. App.* 283, and *State v. Town Council of South Kingston*, 18 *R. I.* 258, 27 *A.* 599, 603, 22 *L. R. A.* 65,. go farther than any other of the cases cited to us or which we have been able to find. Even these do not hold that the courts may compel the issuance of a writ of election for the purpose of filling a supposed vacancy in a legislative body. They do hold that the courts may decide, as questions of law, the existence of vacancies, subject, however, to a final determination of the question by a house of the Legislature. In the first of these cases the court held that a writ of mandamus would lie to compel a County Clerk to certify to the Governor that a vacancy existed in the office of state senator by reason of the fact that the senator had accepted a municipal office. The question of compelling the issuance of a writ of election to fill the vacancy thus created was not before the court. In the *Rhode Island Case,* vacancies in the General Assembly existed because of the failure of the town of South Kingston to elect members, no candidate having received a majority · of the votes cast at two elections held for that purpose. The town refused to order a third election, and in a mandamus proceeding the question was raised whether such election would be valid under the provisions of the applicable statute, it being argued that as the legality or illegality of the holding of the election might be a controlling issue in deciding upon the status of a person claiming to be elected, and, therefore, an issue which the Legislature alone could determine, the court had no jurisdiction. The Court, at first, declined to assume jurisdiction on the ground that the senate and house might declare the election void and thus render nugatory the action of the Court. On rehearing, a majority of the Court of three members changed their position, and assumed jurisdiction to issue a writ of mandamus to compel the town council to order a new election, holding that, while the action of each house with respect to the person claiming to be elected

would be valid and final, yet, none of the steps by which that action was reached, and none of the reasons assigned by either house would have any effect as declaring the law beyond the case then decided. Judge Stiness delivered a vigorous dissenting opinion in which he said:

"It is urged, however, that we do not decide the legality of the election, but simply declare the meaning of the law, and require a ministerial duty to be performed accordingly. This seems to me to beg the whole question. It amounts to our holding that we have jurisdiction because we take it, or to administering the law as plain because we say it is plain, when in fact we have gone outside of the terms of the law, and put a judicial construction upon it, which must of necessity declare in advance the legality of the election; while the other tribunal, to whom the constitution has exclusively confided this class of cases, may decide exactly the reverse. We are not asked to order a duty which is apparent upon an inspection of the law, but a duty which can only be arrived at by a judicial interpretation of the law. When the law says a thing shall be done in a certain way, the court may say to the inferior officer, 'Do it.' It is a straining of terms to say that this is an exercise of judicial functions."

See, also, the dissenting opinion of Finch, J., in *People ex rel. Sherwood v. Board of State Canvassers,* 129 *N. Y.* 360, 29 *N. E.* 345, at *page* 353, 14 *L. R. A.* 646.

. Therefore, apart from the question already decided, that the Lieutenant-Governor, in the circumstances disclosed by the records before us, has no power, authority or duty in the premises, we are unable to approve of the reasoning that would empower us to trench upon the undoubted jurisdiction of the senate to determine the right to a seat in that body, as we have no constitutional power so to do; nor, may we, along the road to an ultimate decision of the question by the tribunal which has the sole power to decide, decree that vacancies in fact exist in despite of the resolution of the senate to the contrary, and compel the issuance of writs of election to fill such vacancies. No court, thus far, has assumed such authority and we are not inclined to be the originators in the usurpation of such power.