2006 OK 89

**In re INITIATIVE PETITION NO. 379, STATE QUESTION NO. 726.**

**No. 102,999.**

Supreme Court of Oklahoma.

Dec. 12, 2006.

**34**

Jack S. Dawson, Kieran D. Maye, Jr., Robert E. Norman, Richard L. Rose, Miller Dollarhide, Oklahoma City, OK, for petitioner/proponent, Rick Carpenter.

D. Kent Myers, Roger A. Strong, Mary Robertson, Jennifer A. Dutton, Jonathan D. Echols Jr., Crowe & Dunlevy, Oklahoma City, OK, for respondents/protestants, Keith Bailey, Clayton Bennett, G.T. Blankenship, John Brock, Bill W. Burgess Jr., Lynne A. Bussell, Luke R. Corbett, Marlin Glass, Jr., Fred Hall, V. Burns Hargis, Kirk Humphreys, George B. Kaiser, Albert Kel Kelly, Jr., Tom Love, Stanley Lybarger, John Massey, Aubrey McClendon, Melvin Moran, J. Larry Nichols, Joseph L. Parker, Jr., Stuart Price, H.E. Rainbolt, Carl R. Renfro, Stacy Shusterman, Sabra Tucker, Steve Turnbo.

Fannie Bates, Pro se respondent/protestant.

Neal Leader, Senior Assistant Attorney, General Oklahoma City, OK, Amicus curiae.

WATT, C.J.

¶ 1 Initiative Petition No. 379, State Question 726 is commonly known as TABOR, an acronym for Taxpayer Bill of Rights. The measure seeks to amend art. 10, § 23 of the Oklahoma Constitution setting limits on the growth of state spending and requiring any surplus funds to be placed in a constitutional emergency fund. Legislative expenditures over limits set by the initiative require voter approval with any citizen having the right to sue to enforce TABOR's provisions.[1]

¶ 2 As previously indicated in the order issued on August 31, 2006, two issues are addressed.[2] Of uppermost concern is whether the circulation and signature gathering process associated with the TABOR petition is so tainted with illegality as to require the entire petition to be struck as invalid. Although the issue of the participation of out-of-state circulators may be determinative, we also address the issue of numerical insufficiency of signers.

¶ 3 The overwhelming evidence reveals involvement of out-of-state circulators in the signature gathering process establishing a pervasive pattern of wrongdoing and fraud. Furthermore, the resistance to discovery and the secrecy surrounding the petition process warrant the garnering of negative inferences concerning the entire operation. Therefore, we determine that the only effective way to protect the integrity of the initiative process and to uphold the constitutional and statutory rights and restrictions associated therewith is to strike the TABOR petition in its entirety. Finally, the initiative fails for numerical insufficiency of signers.

### FACTS

¶ 4 At all times, Rick Carpenter (Carpenter/proponent) has been the named proponent of the initiative petition, appearing in person and by counsel in the legal proceedings. However, except for taking the physical steps necessary to file the initiative petition, Carpenter has acted only as a *pro forma* proponent. The entity actually responsible for the circulation and signature collection process is a Nevada corporation, National Voter Outreach (NVO),[3] headed by Susan Johnson (Johnson) as its President.

---

1. See, Ballot Title, Initiative Petition No. 379, State Question No. 726, filed with the Secretary on September 19, 2005.

2. Issues in elections related to residency have been determined to be matters capable of repetition yet evading review, and thus not moot although the time for balloting has passed. *Krislov v. Rednour*, 226 F.3d 851, 857–58 (7th Cir.2000),

*cert. denied*, 531 U.S. 1147, 121 S.Ct. 1085, 148 L.Ed.2d 960 (2001).

3. This is not the first instance in which NVO's involvement in an initiative campaign has led to litigation. See, *In re Protest of Brooks*, note 30, infra; *Donohue v. Neild*, 2002 N.Y. Slip.Op. 50628(U), 2002 WL 32071700 (N.Y.Sup.2002) [Invalidating signatures collected by NVO's imported out-of-state circulators.]; *Nevadans for*

¶ 5 Carpenter filed IP 379 with the Secretary on September 19, 2005. Within 90 days thereafter, on December 19, 2005, the proponent submitted signatures to the Secretary.[4] On January 24, 2006, the Secretary filed its verification of the required number of signatures and delivered the initiative petition to this Court. The Secretary noted numerous discrepancies contained within the content of the signature pamphlets.[5]

¶ 6 Pursuant to 34 O.S.2001 § 8 and this Court's order of February 6, 2006, notice of the collection of an adequate number of signatures was given along with the opportunity to file a protest within 10 days. Two protests were filed timely. A diverse political and economic group of Oklahoma citizens represented by counsel (collectively, protestants) and a *pro se* protestant, Fannie Bates (Bates), each filed objections to the signature count on multiple grounds. On March 6, 2006, the Court assigned the cause to a Referee to conduct a hearing on the numerical sufficiency of the initiative ordering that, at the conclusion of the inquiry, the Referee file a report with this Court summarizing the evidence, together with findings of fact and conclusions of law. At the Attorney General's behest, the Court entered an order granting an application to appear as *amicus curiae* in support of the protestants.[6]

¶ 7 On several occasions, the protestants found it necessary to file motions to assist in their discovery requests. On June 23, 2006, we issued an order recognizing that the parties and their agents had not voluntarily cooperated in the discovery and hearing process. The order acknowledged that the issue of out-of-state circulators in the signature gathering phase of the initiative process was before the Court and bore directly on the sufficiency of the petition. The Referee was instructed to entertain all discoverable evidence concerning the issue and the parties were ordered to cooperate in the discovery process. It was only subsequent to the issuance of this order that the protestants were able to depose two material witnesses. After the close of evidence, the protestants filed a brief asserting that the entire TABOR petition should be thrown out due to fraud, corruption, illegality and chicanery.

¶ 8 On July 24, 2006, the Referee issued a report finding that the initiative petition should be declared numerically insufficient and should not be placed on the November ballot. The report also outlined the significant evidence demonstrating the knowing and illegal utilization of out-of-state circulators in the initiative process. Exceptions to the Referee's report were filed by both the proponents and the protestants. We issued an order on August 4, 2006, setting a briefing schedule which was concluded with the filing of simultaneous answer briefs on August 24, 2006.

¶ 9 On August 31, 2006, we issued an order determining that: 1) the petition failed for numerical insufficiency of signers; 2) the evidence supported substantial illegal participation of out-of-state circulators; and 3) the request for oral argument should be denied.

*Fairness v. Heller,* 1998 WL 357316 (Nev.Dist.Ct. 1998).

4. Title 34 O.S.2001 §§ 2 and 8.

5. Letter of the Secretary of State, dated January 23, 2006, and filed with this Court the following day. The discrepancies include: circulators listing out-of-state addresses or multiple addresses; various circulators listing the same address; circulators' names appearing at the top of the affidavit with another name on the signature portion of the affidavit; two different notarizations appearing on the same affidavit; two different notary seals appearing on the same affidavit; notaries with the same address as the circulator; notarizations marked through with a different notary added; circulators' signatures and addresses marked through with different addresses added to the affidavit; printed names on the face or signature side of the petition that appeared not to match the signature name as signed on the petition; addresses marked through with different addresses added to the affidavit; printed names on the face or signature side of the petition that appeared not to match the signature name as signed on the petition; and one of the Secretary's temporary employee's addresses appearing as the address of another individual.

6. The Attorney General asserted that TABOR: violated the one general subject requirement of art. 24, § 1 of the Okla. Const.; and that the gist of the proposition was insufficient, misleading and deceptive, making the petition fatally flawed. Our determination regarding the general legality of the initiative process and its numerical insufficiency make addressing these issues unnecessary.

Furthermore, the order provided that a formal opinion would follow[7] specifically addressing the issues of illegal activities by out-of-state circulators in the Oklahoma petition drive and the numerical insufficiency of signers. An order entered on September 8, 2006, affording the Attorney General the opportunity to file a brief addressing the issues identified in the August 31st order. The Attorney General waived the opportunity to brief the issues outlined in his filing of September 12, 2006.

¶ 10 1) **The involvement of out-of-state circulators in the signature gathering process establishes a pervasive pattern of wrongdoing and fraud which, combined with the resistance to discovery and continued secrecy surrounding the operation, require TABOR to be stricken in its entirety. Nothing less will protect the integrity of the initiative process and uphold constitutional and statutory rights and restrictions.**

¶ 11 The organization officially responsible for the circulation of the TABOR petition and registered as the initiative's ballot committee is a non-profit organization, Oklahomans in Action (Action). Although it appears that either Rick Carpenter or Action contracted with some individuals to circulate petitions, NVO was brought in to manage the circulation process. **It was this out-of-state organization's contractual responsibility to ensure that enough signatures of Oklahoma voters were collected to qualify the initiative for placement on the November ballot.[8]** Apparently, NVO then either contracted with another organization, PoliticalActivists.org, or authorized its independent contractors to open offices in Oklahoma and Tulsa under the Political Activist's name.[9]

¶ 12 a) **TABOR is not an Oklahoma initiative funded by Oklahoma citizens interested in changing Oklahoma law.**

¶ 13 One of the reasons given for bringing in the out-of-state organization was its prior success in qualifying initiative petitions in Oklahoma. Evidently, NVO has been involved in approximately ten other petition drives in this state.[10] The contract between NVO and Action and/or Carpenter provided for payment of all signatures collected during the TABOR drive.[11] It is difficult to determine how much NVO actually collected for its efforts in Oklahoma, as it resisted disclo-

---

7. *In re Initiative Petition No. 314*, 1980 OK 174, ¶ 3, 625 P.2d 595.

8. Transcript of proceedings, June 16, 2006, deposition of Richard Carpenter read into the transcript providing in pertinent part at pp. 8–9:

 "... Q When you say NVO was the professional wing, what was NVO's responsibilities?
 A. They were pretty much a-to collect-their responsibility was to qualify the petitions.
 Q. What do you mean qualify?
 A. To collect sufficient signatures and get this thing on the ballot...."

9. Transcript of proceedings, deposition of Richard Carpenter read into the record providing in pertinent part at p. 14:

 "... Q. Now, let me see if I understand correctly, it went from OIA, Oklahomans In Action, and then Oklahomans In Action hired NVO; is that correct?
 A. Uh-huh.
 Q. Then NVO hired PoliticalActivists.org, do you know?
 A. I assume. I don't know though...."

10. Transcript of proceedings, Linda Vanette Howard testifying in pertinent part at pp. 76–8:

 "... Q. Now, have you worked on campaigns with NVO before the TABOR campaign?
 A. Yes.
 Q How many?
 ... THE WITNESS: You know, I'm not sure because over the years I've worked for National Voter Outreach on a number of campaigns, but I'm going to say probably eight or ten campaigns...."

11. Proponent Rick Carpenter's Answers to Protestants' First Set of Interrogatories, Requests for Production & Requests for Admission, Exhibit 1000, provides in pertinent part at pp. 5–6:

 "... As to organizations or other entities known to Mr. Carpenter to have circulated the Stop Overspending Initiative Petition, Mr. Carpenter hereby states that the company known to him as responsible for the actual circulation of the Petition is PoliticalActivists.Org. Oklahomans in Action, a non-profit corporation registered as the ballot committee for initiative petition 379 ... OIA agreed to pay National Voter Outreach, Inc. of Ludington, Michigan to organize and oversee the collection of signatures, because of their experience and success qualifying initiative petitions in Oklahoma. The agreement with NVO expired when payment was made in full for the signatures collected, at the conclusion of the Stop Overspending Initiative Petition drive...."

sure of this information.[12] Nevertheless, from evidentiary submissions, it appears that the organization received approximately one half million dollars for its circulation efforts during the initiative drive.[13]

¶ 14 The ethics reports filed by Action during the petition period indicate total expenditures of almost two million dollars in the initiative effort.[14] The same disclosures further demonstrate that **TABOR was not an Oklahoma initiative, circulated by Ok-** lahomans **interested in changing Oklahoma law.** Contributions to the effort came largely from out-of-state entities. **By the end of December, 2005, out-of-state entities headquartered in Illinois, Virginia, Colorado and Washington, D.C., had contributed $1,205,000.00 to the initiative campaign.**[15]

¶ 15 Depending on the contract at issue, circulators were paid up to half of their com-

12. We note that there is no prohibition in Oklahoma against the payment of individuals for the collection of signatures in an initiative drive. Further, we are aware that prohibitions against such payments have been determined to violate the First Amendment of the United States Constitution as burdens on political expression. *Meyer v. Grant*, 486 U.S. 414, 428, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); *On Our Terms '97 PAC v. Secretary of State of State of Maine*, 101 F.Supp.2d 19, 25 (D.Me.1999); *Term Limits Leadership Council, Inc. v. Clark*, 984 F.Supp. 470, 472 (S.D.Miss 1997). Nevertheless, statutes which merely affect the manner in which circulators are paid have been found to pass constitutional muster. *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 617 (8th Cir.2001). This Court is also cognizant that requiring a company such as NVO to disclose its paid circulators and the amount each individual received may have constitutional ramifications. *Buckley v. American Constitutional Law Foundation, Inc.* 525 U.S. 182, 203, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). Although NVO resisted disclosure of the amount it received for its participation in the circulation of the TABOR petition, it did not raise a constitutional privilege to such disclosures and amounts cited herein are part of the record.

13. Invoice # 3, dated October 12, 2005, indicates that circulators were being paid $1.48 per signature and a total amount due on receipt of $16,617.44. Invoice # 4, dated October 12, 2005, demonstrates that circulators were being paid $1.48 per signature and a total due on receipt of $15,101.92. Invoice # 5 shows circulators to be paid $1.48 per signature and a total due on receipt of $22,342.08. Invoice # 7, dated November 1, 2005, indicates that circulators were being paid $1.48 per signature and that $34,562.44 was due upon receipt. Invoice # 8, shows a total of $9,150.43 due upon receipt. Invoice # 11, dated November 22, 2005, shows that circulators were being paid $1.73 per signature, travel was paid to 14 pro circulators, bonuses of $200 to 5 circulators, and a pro's headhunter and management fee of $1,500.00 for a total due on receipt of $59,660.96. Invoice # 12, dated November 29, 2005, demonstrates that circulators were being paid at a rate of $1.73 per signature and that $33,216.00 was due upon receipt. Invoice # 14, dated December 6, 2005, showing an amount due on receipt of $160,000.00. The invoice makes it apparent that an initial payment of $30,000.00 was made to NVO. Invoice # 15, dated December 16, 2005, showing an amount due on receipt of $78,612.82.

On October 6, 2005, an electronic mail communication from Dave Pearson to Bill Wilson indicates that NVO had already been paid $118,000.00 and could expect $75,000.00 to $80,000.00 in additional funds that day. On November 18, 2005, an electronic mail communication from Susan Johnson to John Tillman, Craig Regens, Paul Jaboc and Heather Wilhelm indicates that there was $234,000 outstanding and owing to NVO. **It is also interesting to note that NVO was billing at the same time for circulation of the KELO petition, which was being circulated contemporaneously with TABOR. Invoice # 2, dated November 2, 2005, shows a total of $1,390.22 due upon receipt; Invoice # 3, dated October 12, 2005, shows a total of $16,617.44 due upon receipt; Invoice # 4, dated October 18, 2005, shows a balance due of $28,087.44 due upon receipt; and Invoice # 7, dated November 2, 2005, shows a balance due upon receipt of $3,667.52. Most certainly, NVO collected in excess of $50,000 for its efforts on this petition drive.**

14. For the period of 10/1/05 to 10/31/05, Action reported total expenditures of $203,697.99 of which $200,000 were for petition circulation. For the period of 11/1/05 to 11/30/05, Action reported expenditures totaling $624,981.12 of which $406,570.73 was paid directly to NVO. For the period of 12/1/05 to 12/30/05, Action reported expenditures of $1,018,086.30 of which $326,067.34 was for petition circulation.

15. Schedule A1. to Action's Campaign Contributions & Expenditures Report filed in December of 2005 shows year-to-date contributions from: Americans for Limited Government, an organization with a Glenview, Illinois address, of $575,000.00; National Tax Payers Foundation out of Alexandria, Virginia, $180,000.00; Legislative Education Action Drive with an address in Glenview, Illinois, of $70,000.00; Americans for Tax Action of Washington, D.C., of $225,000; and Colorado Club for Growth, with a Colorado Springs address, of $200,000.00.

pensation in cash. Payments were not based on the number of legally acceptable signatures collected as long as validity rates ranged from 75 to 80 percent.[16] Some circulators were paid for signatures in advance of their collection.[17] Others were paid recruiting bonuses of $75.00 when they brought in a circulator who collected 200 signatures.[18] In addition, circulators were given other incentives to bring in a certain number of signatures per week.[19] At least one circulator residing in Georgia was paid a $1,000.00 bonus to extend his stay through the end of the circulation process.[20] The circulators denominated by NVO as "pros" most often collected 100–200 signatures per day[21] and were paid

16. The circulation contract of PoliticalActivists.org provides in pertinent part:

> "... 15. Upon turning in signatures for compensation, they will be purged in office and you will receive ½ of your compensation (up to $50 of which may be in cash—the balance will be in the form of a check) and a copy of your turn in receipt.
> 16. Your signatures will be shipped to our processor's office for a final count and validation. Those results will be deemed final and we will post a print out in our office showing your final count and validity and you will receive the other ½ of your compensation within 7 working days (up to $50 of which may be in cash-the balance will be in the form of a check).
> 17. The other ½ of your compensation is based on having at least 80% of the total signatures signed by registered Oklahoma voters. If the validity of your signatures is below 80%, compensation is pro-rated and you are paid only for the percentage of valid signatures...."

Another contract, which does not list the company's name but which is headed as "Circulator Independent Contractor Agreement" provides in pertinent part:

> "... 3 .... g. That fall below a validity rate of 75% accuracy...."

A contract entitled "Circulator Independent Contractor Agreement" provides in pertinent part:

> "... 3. Company reserves the right to not purchase signatures which do not meet the above stated requirements, or are found to be forgeries, or which fall below a 75% validity rate...."

17. Electronic mail dated December 11, 2005, from *Rjac1032382@aol.com* [Rosemary] to Susan Johnson (NVO) concerning circulator Howard Hudson and providing in pertinent part:

> "... Since Nov 21 there has been a problem with Howard's validity-contrary to his previous turn in's....
> I have paid Howard advances on his signatures from the 21st which amounted to [amount blanked out] while I worked on his validity. I counseled with Howard about his validity and he stated he understood the problem. In the meantime it has come to my attention through several reliable sources that Howard has other people working for him and is turning in signatures for them (possibly under his name) ..."

18. Electronic mail transmission from Susan Johnson to Paul Jacobs, Rick Carpenter and Dave Pearson, dated October 18, 2005, providing in pertinent part:

> "... We instituted a $75 recruiting bonus to circulators for anyone they bring in who collects 200 signatures...."

19. Transcript of proceedings, June 16, 2006, Linda Vanette Howard testifying in pertinent part at pp. 72–3:

> "... Q. Perhaps in the way of bonuses?
> A. Correct. And incentives of a different kind.
> Q. What types of incentives were used?
> A. We did some bonuses. We gave things like an ounce of silver if they brought in a certain amount of signatures in a week. A little bonus if they brought in a certain amount of signatures a week...."

20. Transcript of proceedings, June 16, 2006, Linda Vanette Howard testifying in pertinent part at p. 100:

> "... Q. Now, there's a reference if you look down to December 17th, $1,000 bonus for staying?
> ... A. I paid Russell a bonus. I told you I've known Russell for years. While he was here, I really wanted him to work on the petition, he's a very good circulator.
> And so I told him that if he would work on the petition while he was here and stay, because I know he was taking time to look for property too. And I told him that if he would stay with me until the end of the campaign that I would bonus him, and I did...."

21. Electronic mail transmission from Susan Johnson to Paul Jacobs and Rick Carpenter dated November 29, 2005, providing in pertinent part:

> "... Our pros are also having trouble with access. Our Missouri crew of 6 (one dropped) that arrived on Wednesday has collected just 1500 signatures over their first 4 days circulating. That is an average of 62 signatures per day each. These are people who are used to collecting 100–200 per day....
> I have 12 pro's confirmed still in town today.... My plan, unless I hear otherwise today, is to reduce the bonus number for pros from 800 a week to 600.... This should help them reach at least that level of production for the $200 exp bonus. We need to discuss our

on a per-signature basis.[22] While invoices generated by NVO indicate that circulators were paid between $1.48 and $1.73 per signature, individual managers had the option of paying circulators under them at higher rates[23] and did so on some occasions.[24] At least one of the out-of-state circulators was paid in excess of twelve thousand dollars for his work on TABOR in Oklahoma.[25] Another circulator, who advised Action that NVO had failed to pay for signatures collected, was paid $500.00 for collecting approximately 200 signatures—a per signature cost of $2.50.[26]

¶ 16 b) **Although precious, the initiative right is not absolute; the parameters of** the rights and restrictions are established by the Oklahoma Constitution, legislative enactments and this Court's jurisprudence.

### Pivotal to the integrity of the circulation process is the Oklahoma residency of circulators.

■■■■ ¶ 17 Oklahoma citizens are endowed with the right of the initiative by the Oklahoma Constitution, art. 5, §§ 1 and 2.[27] The right is fundamental.[28] Therefore, this Court zealously preserves the precious right of the initiative to the fullest measure of the spirit and the letter of the law.[29] Although

---

next move, I think it's time to consider a rate increase across the board and leave in place production bonuses. I will continue to try and bring in additional pro's using the recruiting bonus plan instituted last week...."

**22.** See generally, Deposition of Susan Johnson, June 26, 2006, pp. 101–02.

**23.** Transcript of proceedings, June 16, 2006, Linda Vanette Howard testifying in pertinent part at p. 74:

"... Q. Did you have—as manager, did you have the discretion to pay more per signature than what was mandated by NVO?
A. Yes, I guess we always have that option because we are contractors...."

**24.** Transcript of proceedings, Linda Vanette Howard testifying in pertinent part at pp. 70–1:

"... Q. How did you determine how much you would pay circulators?
A. Well, usually National Voter Outreach suggested an amount that's what I paid. There are times I have paid more to circulators, you know, made an agreement with them because as the contractor I can do that...."

**25.** Transcript of proceedings, June 16, 2006, Linda Vanette Howard testifying in pertinent part at p. 97:

"... Q. Could you identify it for the record, please?
A. It's a 1099 for Russell Baggett, 1111 Steeple Run, Lawrenceville, Georgia 30043. And he made $12,563...."
This same witness identified 1099's issued to other out-of state circulators: Marie Kuhn of Dacula, Georgia was paid $3,767.80; and Steve Giordana of Thornton, Colorado was paid $2,908.50. Although other NVO managers agreed to provide other payment information, such documents have not been forthcoming.

**26.** Transcript of proceedings, June 16, 2006, deposition of Richard Carpenter read into the record providing in pertinent part at pp. 6–7:

"... Q. Did OIA ever pay circulators?
... A. Yes, we have paid circulators.
Q. Tell me about that. You were getting ready to tell me?
A. A couple of weeks ago I wrote a check to a guy who collected some signatures that had not been paid by NVO....
Q. How much did you pay him?
A. I believe about $500.
Q. How many signatures did he collect?
A. About 200 something, I think...."

**27.** The Okla. Const. art. 5, § 1 provides:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."
The Okla. Const. art. 5, § 2 provides in pertinent part:
"The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed.... The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of votes cast in the last general election for the State office receiving the highest number of votes at such election."

**28.** *In re Initiative Petition No. 362,* 1995 OK 77, ¶ 12, 899 P.2d 1145.

**29.** *In re Initiative Petition No. 349,* 1992 OK 122, ¶ 35, 838 P.2d 1, *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993); *Oliver v. City of Tulsa,* 1982 OK 121, ¶ 11, 654 P.2d 607;

states allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process,[30] we will not cripple, avoid or deny by technical construction the initiative right.[31] Rather, because the right of the initiative is so valuable, all doubt as to the construction of pertinent provisions is resolved in favor of a measure.[32] Nevertheless, **the right of the initiative is not absolute.** It is subject to constitutional and statutory limitations.[33] Each citizen has a right to protest the sufficiency and legality of an initiative petition and **the safeguards afforded the individual challenging a measure are as necessary to the protection of the right as are those granted the proponent.**[34] It is this Court's duty to ensure that, in the exercise of the initiative, the provisions of the Constitution and duly enacted statutes are upheld.[35]

 ¶ 18 The proponents recognize that under art. 3, § 1,[36] to qualify as a circulator, an individual must be a *bona fide* Oklahoma resident. The dispute arises over how residency is defined for constitutional purposes. Largely, NVO was unconcerned with whether circulators met residency requirements during the TABOR petition drive as it did not ask for Social Security numbers, driver licenses or any identification before it made payments for signatures gathered.[37] **The organization's attitude on residency was that if a circulator came into Oklahoma with the intention of staying only for the duration of the petition drive[38] or could provide some address within the state,[39] the circulator was an Oklahoma resident—a premise not supported by Oklahoma law.** The organization allegedly adopted this position based on information provided by an employee of the Oklahoma Secretary of State's office.[40] This, in itself, is

---

*In re Referendum Petition No. 18,* 1966 OK 152, ¶ 11, 417 P.2d 295.

30. *Buckley v. American Constitutional Law Found., Inc.,* see note 12 at 224, 119 S.Ct. 636, supra; *In re Protest of Brooks,* 2003 Ohio 6348, ¶ 15, 155 Ohio App.3d 370, 801 N.E.2d 503.

31. *In re Initiative Petition No. 360,* 1994 OK 97, ¶ 9, 879 P.2d 810; *Ruth v. Peshek,* 1931 OK 674, ¶ 25, 5 P.2d 108.

32. *In re Initiative Petition No. 349,* see note 29, supra; *Ruth v. Peshek,* see note 31, supra.

33. The United States Const. art. IV, cl. 2; Okla. Const. art. 1, § 1; Okla. Const. art. 5, § 6; *In re Initiative Petition No. 349,* see note 29, supra; *In re Initiative Petition No. 348,* 1991 OK 110, ¶ 5, 820 P.2d 772; *In re Initiative Petition No. 344,* 1990 OK 75, ¶ 14, 797 P.2d 326.

34. *State ex rel. Bryant v. Carter,* see note 84, infra.

35. *In re Initiative Petition No. 349,* see note 29 at ¶ 19, supra; *State ex rel. Bryant v. Carter,* see note 84, infra; *Ralls v. Wyand,* 1914 OK 28, ¶ 2, 138 P. 158.

36. The Okla. Const. art. 3, § 1 provides:
"Subject to such exceptions as the Legislature may prescribe, all citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state."

37. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 24:

"... Q NVO doesn't ask for Social Security Numbers or driver license or any identification before they issue payments.
A No...."

38. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at pp. 55–56:
"... Q Was it NVO's official position that if someone comes to the State of Oklahoma in connection with a duty or work and resides in, stays in, a motel while they are doing their duty or work that they're residents?
... A It is my opinion and here stated in this memo that a resident is someone who intends to stay in the State of Oklahoma and that in the State of Oklahoma there is no law deciding how long they have to intend to stay.
These people intended to stay for the course of the work....
Q It would be your testimony intent to stay for the course of the work would qualify as a resident?
... A If there's an intention to reside in the State of Oklahoma they are a resident.
Q For the course of the work?
A For any course...."

39. Deposition of Jeff Johnson, June 26, 2006, providing in pertinent part at pp. 31–2:
"... Q So you would have allowed them to circulate just so long as they had some address they could give you inside the state of Oklahoma?
A Yeah...."

40. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at pp. 108–9:
"... MR. MADISON: ... Susan Johnson has a recollection on residency policy that she would like to clarify...."

curious as NVO represents itself as an organization armed with the "essential elements of a campaign" including "knowledge of local law." [41] Furthermore, an entity relying on representations of a public official does so at its peril—such reliance is not sufficient to excuse ignorance of the law as it actually exists.[42]

¶ 19 The terms residency and domicile are interchangeable and synonymous.[43] Although generally the issue of residency is a question of fact for the trier of fact [44] to determine from the clear weight of the evidence,[45] the residency requirement for voting in the constitutional sense is a judicial question.[46] **A *bona fide* resident for purposes of art. 3, § 1 is equated with a person's honest intent to make a place one's residence or domicile, a conscious decision to make a location an individual's home.** Physical presence, as in merely crossing the Okla-homa state line, will not constitute residency.[47] Residency requires a person to have a true, fixed, permanent home to which the individual, when absent, expects to return.[48] It is where the person lives.[49] Although an individual may have multiple dwellings, a natural person has but one residence.[50] The dominant element in determining legal residence is the intention to abandon a former domicile and to acquire another without any intention of returning—present abode, in and of itself, is not conclusive.[51]

¶ 20 Just as it is this Court's constitutional duty to determine residency as it relates to elections, the Legislature shoulders the constitutional responsibility pursuant to art. 5, § 8 to enact laws to prevent corruption in making, procuring, and submitting initiative and referendum petitions.[52] It has done so in three provisions relating to circulators in title 34. Section 3.1 [53] makes it a crime

THE WITNESS: ... [W]e spoke to Veda in the Elections Division at the Secretary of State's office in Oklahoma City....
Veda specifically said that they didn't-they only had to come into-they had to cross the-roughly what she said was they had to cross the Oklahoma border to become a resident of Oklahoma and they didn't have to have an intention to stay...."

41. VOA's website, *www.directdemocracy.com*, contains the following statement:

"Essential elements of a campaign include knowledge of local laws, speed and reliability. Because NVO represents all three, we attract the kind of employees who demonstrate year after year, how to get the job done. This explains why NVO became the go-to firm when the job needs to be done on short notice."

42. *General Motors Corp. v. Oklahoma County Bd. of Equalization*, 1983 OK 59, ¶ 17, 678 P.2d 233, cert. denied, 466 U.S. 909, 104 S.Ct. 1689, 80 L.Ed.2d 163 (1984); *Rose Bros., Inc. v. City of Alva*, 1960 OK 231, ¶ 24, 356 P.2d 1083; *Cochran v. Norris*, 1935 OK 1036, ¶ 0, 51 P.2d 736; *City of Enid v. Warner–Quinlan Asphalt Co.*, 1916 OK 1010, ¶ 0, 161 P. 1092.

43. *Groseclose v. Rice*, 1961 OK 251, ¶ 4, 366 P.2d 465; *Richards v. Huff*, 1930 OK 547, ¶ 6, 293 P. 1028.

44. *Moore v. Hayes*, 1987 OK 82, ¶ 8, 744 P.2d 934; *Groseclose v. Rice*, see note 43, supra.

45. *McElreath v. McElreath*, 1957 OK 234, ¶ 2, 317 P.2d 225; *Chappell v. Chappell*, 1956 OK 190, ¶ 0, 298 P.2d 768, 58 A.L.R .2d 1214.

46. *Stevens v. Union Graded School Dist. No. 2 of Canadian County*, 1929 OK 131, ¶ 9, 275 P. 1056; *Box v. State Election Bd. of Oklahoma*, see note 49, infra.

47. *Stevens v. Union Graded School Dist. No. 2 of Canadian County*, see note 46, supra.

48. *Richards v. Huff*, see note 43, supra.

49. *Box v. State Election Bd. of Oklahoma*, 1974 OK 104, ¶ 12, 526 P.2d 936; *Heiny v. Sommers*, 1928 OK 421, ¶ 10, 268 P. 287.

50. *State ex rel. Cartwright v. Hillcrest Investments, Ltd.*, 1981 OK 27, ¶ 20, 630 P.2d 1253, 21 A.L.R.4th 1312.

51. *Moore v. Hayes*, see note 44, supra.

52. The Okla. Const. art. 5, § 8 provides:

"Laws shall be provided to prevent corruption in making, procuring, and submitting initiative and referendum petitions."

53. Title 34 O.S.2001 § 3.1 provides:

"It shall be unlawful for any person other than a qualified elector of the State of Oklahoma to circulate any initiative or referendum petition to amend, add to, delete, strike or otherwise change in any way, the Constitution or laws of the State of Oklahoma, or of any subdivision of the State of Oklahoma. Every person convicted of a violation of this section shall be punished by a fine of not to exceed One Thousand Dollars ($1,000.00), or by imprisonment in the

punishable by a fine of up to $1,000.00 and a year in the county jail for any person other than a qualified **elector—a United States citizen over the age of 18 and a *bona fide* Oklahoma resident**—to circulate an initiative petition. Section 6 requires circulators to verify every petition by sworn testimony that the circulator is a qualified **elector—a United States citizen over the age of 18 and a *bona fide* Oklahoma resident**—signing the verification and giving an address.[54] Pursuant to § 23, it is a felony punishable by a fine of up to $500.00, imprisonment up to two years in a state penitentiary, or both to sign or file any certificate or petition knowing the same or any part thereof to be falsely made.[55] Therefore, any circulator signing a verification who is not a qualified **elector—a United States citizen over the age of 18 and a *bona fide* Oklahoma resident**—or anyone who aides and abets a circulator in doing so commits a felony.

¶ 21 The Legislature's focus on the circulator's pivotal role in the initiative proceedings acknowledges the importance of the signature gathering process. Indeed, the integrity of the initiative process in many ways hinges on the trustworthiness and veracity of the circulator.[56] Although the Secretary's records may be utilized to verify whether a certain individual is a registered voter, the Secretary and this Court have no ability to ascertain whether a particular voter actually signed a petition. **Residency requirements ensure that when such issues arise, the circulators will be Oklahoma residents who may be located within state lines and be subject to service for appearance in Oklahoma Courts.**[57]

■ ¶ 22 The Legislature has made it the responsibility of the circulator to verify that an individual voter actually signed the petition. Circulators must swear that the individual listed on the petition sheet signed the petition in their presence. Furthermore, each time that a circulator executes the verification of signatures, the individual must swear to be "a qualified elector of the State of Oklahoma" and provide a post office address.[58] Nothing less than an accurate address for the circulator will constitute substantial compliance with the statutory requirement of providing a post office address.[59] Not only does the proven execution of a false affidavit constitute fraud, it destroys all probative value of the verification.[60]

¶ 23 **c)The overwhelming evidence reveals that NVO knowingly used in excess of sixty out-of-state circulators, recruited other out-of-state organizations to bring in circulators, and allowed a foreign national to collect signatures and another circulator to verify the petition—all of which are illegal activities under Oklahoma law.**

■ ¶ 24 **The evidence presented leads to one undeniable conclusion—the out-of-**

---

county jail for not to exceed one (1) year, or by both said fine and imprisonment."

54. Title 34 O.S.2001 § 6 provides in pertinent part:
"Each sheet of every such petition containing signatures shall be verified on the back thereof, in substantially the following form, by the person who circulated said sheet of said petition by his or her affidavit thereon and as a part thereof:
... I, _____, being first duly sworn, say: That I am a qualified elector of the State of Oklahoma ... (Signature and post office address of affiant.) ... "

55. Title 34 O.S.2001 § 23 provides in pertinent part:
"Every person ... who signs or files any certificate or petition knowing the same or any part thereof to be falsely made ... shall upon conviction thereof be guilty of a felony and shall be punished by a fine of not exceeding Five Hundred Dollars ($500.00) or by imprisonment in the State Penitentiary not exceeding two (2) years, or both such fine and imprisonment in the discretion of the court before which such conviction shall be had."

56. *Maine Taxpayers Action Network v. Secretary of State*, 2002 ME 64, ¶ 13, 795 A.2d 75.

57. *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614–15 (8th Cir.2001); *Kean v. Clark*, 56 F.Supp.2d 719, 732 (S.D.Miss.1999).

58. Tile 34 O.S.2001 § 6, see note 54, supra.

59. *In re Initiative Petition No. 272, State Question No. 409*, 1963 OK 285, ¶ 0, 388 P.2d 290.

60. *In re Initiative Petition No. 347, State Question No. 639*, 1991 OK 55, ¶ 48, 813 P.2d 1019.

state circulators had no intention to make Oklahoma their legal residence. **The question is not whether out-of-state circulators were used in the initiative drive, the question is only how many.** We can be certain that there were more than sixty out-of-state circulators working the Tabor petition.

■ ¶ 25 Circulators act as agents for those on whose behalf they are collecting signatures.[61] When Johnson admitted that she had brought in circulators from other states, she couldn't remember the exact number, their identities or their states of resi-

dence.[62] When questioned about sixty-two pros whom she had indicated in an electronic mail transmission would be coming in, she couldn't recall who any of those individuals were.[63] Not only did NVO use it's own out-of-state circulators, it drafted assistance in the circulation efforts from other foreign petition firms.[64] Johnson remembered contracting with a manager from California who agreed to provide a team of circulators and to collect 10,000 signatures.[65] Also, Johnson was aware that pros were recruiting people from outside Oklahoma to circulate the TABOR petition; and, armed with this knowl-

61. *Blankenship v. Blackwell*, 429 F.3d 254, 258 (6th Cir.2005), rehearing and rehearing *en banc* denied (2006); *State ex rel. Comm. for the Referendum of City of Lorain Ord. No. 77–01 v. Lorain County Bd. of Elections*, 96 Ohio St.3d 308, 774 N.E.2d 239, 248 (2002).

62. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part:
at p. 31: "... Q Would you look in your email. You have a notation that says 10 pros 6 weeks. What are you talking about there?
... A At the time the email was written I was looking at bringing 10 pros in.
Q 10 pros into the state from where?
A I don't remember.
Q But not from in state?
A Right.
Q Were those 10 pros referenced in this November 5, 2005 email ever brought in to the state?
A Since I don't know in this particular email I don't know whether those particular people came in...."
at p. 32: "... Q Do you have any idea who these particular 7 pros were?
A No.
Q Just so I understand this, might make things simpler, any time you say we have 7 pros coming in that means you're bringing in x-number of people, in this case 7, from out of the state to circulate the Tabor Petition?
A Yes...."
at p. 38: "... Q Would you look at the third sentence. Actually, read the second and third sentence into the record.
A I'm bringing Steve Drattell in with a crew of 6 to the outlying areas. Two will arrive from Missouri today and he should be there some time tomorrow.
Q When you say two will arrive from Missouri today, is that referring to Steve Drattell or his crew of 6?
A I don't know...."
at p. 39: "... Q Would you read the first two sentences into the record.
A Our pros are also having trouble with access. Our Missouri crew of 6 one dropped that ar-

rived on Wednesday has collected just 1500 signatures over their first four days circulating.
Q Who is the Missouri crew of 6?
A Steve Drattell's crew....
Q Do you know who was in Steve Drattell's crew?
A No...."

63. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 44–45:
"... Q ... Would you please read the first line of the second paragraph?
A We have commitments from 62 pros to be in the state by Friday. I'm continuing to encourage others to come. Reports are that California ends tomorrow....
Q Who are the 62 pros? Who are you referring to?
A. You want names?
Q Yes.
A I don't have them...."

64. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 13:
"... Q What documents have you produced?
A I produced a document on the numbers of signatures that I believe were collected by management teams outside the state.
Q If I could stop you right there. When you say management teams, so I understand what you're talking about, what do you mean?
A I contacted managers, other petition firms, outside the state to come help...."

65. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 47:
"... Q Is it also for him to bring people or just for him?
A Michael Rhodes agrees to provide management services for Oklahoma resident petitioners he recruits with an expected production of 10,000 signatures....
Q When you entered into this agreement did you testify you knew he lived in California?
A Yes...."

edge, she allowed the signature collection to continue.[66] Johnson knew that at least one foreign national collected signatures and that those signatures were submitted under another circulator's name.[67] Although she admitted that NVO paid travel and hotel expenses for these out-of-state circulators, she couldn't remember which circulators were paid for plane travel.[68] Where travel was paid, Johnson assumed it was for out-of-state circulators.[69]

¶ 26 Many of the out-of-state circulators were referred to as "pros" by NVO and its agents or independent contractors operating in Oklahoma. These individuals were known to NVO to be people who made their living moving from state to state acting as circulators in multiple petition drives.[70] The man-

ager of the Tulsa office acknowledged that he had pros working out of his office and that he knew there were pros working under other managers in Oklahoma, but he could not remember their names or exactly how many circulators were involved.[71]

¶ 27 When a notary was questioned about the identifications provided her, she indicated that she received out-of-state identifications from the states Pennsylvania, Virginia and Kentucky. The notary also stated she couldn't remember all of the out-of-state individuals and that when she entered the majority of their names on her notary log, she did not utilize the address on the out-of-state identification but an address where they could be located in Oklahoma.[72] When the

66. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 49:

"... Q After you gained that knowledge what did you do next? Did you allow the teams to continue circulating the Tabor Petition?
A Yes...."

67. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at pp. 114–5:

"... Q How do you know Hermine Wu?
... Q Was she a circulator in the Tabor Petition in Oklahoma?
A Yes.
Q I didn't see any petitions with Hermine Wu's name on them.
... Q How could that be? If she was a circulator which petitions did she circulate and who signed them?
A I don't know who signed them....
Q Did you talk to Michael Rhodes about Hermine?
A I did....
Q Did you ask him whether or not she was a legal resident?
A Yes.
Q What was his response.
A She was not...."

68. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part:

at p. 33: "... Q What type of expenses would they bill you for?
A Hotel. Travel...."
at p. 36: "... Do you know of anyone on this list who you would say flew in from outside the State of Oklahoma to circulate the Tabor Petition?
A. No...."
at p. 37: "... Q Which ones do you know that it happened on this campaign? You say you know on this particular campaign circulators

flew in from out of state to circulate a petition in the State of Oklahoma.
Which circulators do you know did that?
A I know Joseph Carter did....
Q How do you know that?
A Well, maybe I don't know...."

69. Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 52:

"... Q Are you personally making the assumption if they bill you for travel expenses they're bringing in people from out of the state?
A Yes...."

70. Deposition of Jeff Johnson, June 26, 2006, providing in pertinent part at p. 70:

"... Q What is a pro?
A Well, they're ones that travel around the country that do it for a living that don't just do it one time...."

71. Deposition of Jeff Johnson, June 26, 2006, providing in pertinent part at pp. 69–71:

"... Q ... And you know Tina Morris came in. Do you know where she came in from?
A Texas.
Q Do you know where Tina Morris is today?
... A She travels around the country collecting signatures....
Q Do you know of any other pros that worked out of any other office?
... A Um-hum. Hum, well,-well, there was three people that worked out of Linda's office.
Q Okay. Who were those people?
A I can't remember their names...."

72. Deposition of Jane Ann Eades, April 14, 2006, providing in pertinent part:

at pp. 30–32: "... Q. And what type of identification did you ask for?
A. I didn't ask for. I demanded. I demanded a state ID or some sort of picture ID. Not

protestants realized that at least one notary had been notarizing petitions without a bond, they flew circulators back into Oklahoma so that their signatures could be properly notarized.[73]

¶ 28 The petition managers had circulators in the field about whose validity they were concerned. During December, the petition managers became aware that at least one of their circulators was turning in signatures collected by others under his name.[74] To ensure that out-of-state circulators questioned by police and asked for identification would not be arrested or ordered to cease

signature collections, circulators were encouraged to obtain Oklahoma identification.[75]

**¶ 29 d) NVO's resistance to discovery and the secrecy surrounding its operation warrants an inference that the organization and the entire circulation process lacked all integrity.**[76]

¶ 30 To say that NVO resisted discovery efforts would be a gross understatement. The protestants attempted service on the organization's President on a number of occasions and even hired a private investigator to locate Johnson but were entirely unsuccessful. It was only after this Court issued an

---

necessarily state but it had to be, you know, some sort of ID.
Nine times out of ten was Oklahoma or other state licenses or ID's....
Q. I want to make sure we understand your testimony too.
Nine times out of ten the circulators gave you an Oklahoma driver's license?
A. About that, yeah. I think there were three or four that lived in Tulsa that did not have an Oklahoma I.D. They had Pennsylvania and Virginia, you know, Kentucky....
Q. Do you remember any of those peoples' names?
A. Yeah. Judy Wolfe, she has a Pennsylvania ID. Linda Rogers, she has a Kentucky ID. I don't remember everybody ...
Q. I apologize. I meant the address on the driver's license into your journal?
A. No.
Q. You did not write that. Which address did you write down in your journal?
A. The address in which they lived. The address in which I could contact them if I needed to.
Q. When you say the address in which they lived, does that mean the address which they verbally gave you or the address—
A. Yes.
Q. So, if the address on their identification was different than the address they verbally gave you you wrote down the verbal address; is that correct?
A. Right ...
Q.... Do you remember any other individuals that had given you an out of state ID?
A. There was more than that but, no, offhand I don't remember their names. I mean I can tell you that—what was the name, little Tina, I don't know her name, Tina something or another...."
at p. 45: "... Q.... Mr. Philip Alpert, do you know him?
A. Yeah, I know Philip Alpert. He was a pro. He is a pro...."

**73.** Deposition of Melody J. Eckert, April 14, 2006, providing in pertinent part at pp. 34–36:

"... Q. Just tell me about generally what happened that day?
A.... And then the night, that night before the night that we were supposed to be traveling to Oklahoma City Jan asked if I had my bond. And I said I don't know, I thought that when I paid for my notary that I had my bond.
... And when we got to Oklahoma City and we were working that night, I asked Susan Johnson about it and she told me at that point that it is required.
And then we all kind of like started to panic a little bit and we immediately started calling people, calling the circulators that I notarized for to get them back into the office in Tulsa to renotarize their signature or their petitions. And they also flew people in, people that were from out of state ...
Q. [Portion of question missing] people in who were out of state at the time, correct?
A. Susan Johnson contacted them and had them fly in...."

**74.** Electronic mail dated December 11, 2005, from *Rjac1032382@aol.com* [Rosemary] to Susan Johnson (NVO) concerning circulator Howard Hudson, see note 17, supra.

**75.** Transcript of proceedings, June 29, 2006, Robert Arthur Colby [a circulator with a permanent address in Sacramento, California] testifying in pertinent part at p. 93:

"... Q. When did you find out that it was against the law that you had to be a resident to be a circulator?
A. When I was with David Jackson out petitioning. That's when Rosemary had called him and told him that we—there were people being arrested for it. That's when we found out the law.
Q. And that's when you went to get the Oklahoma ID?
A. That's correct...."

**76.** *Citizens Committee for D.C. Video Lottery Terminal Initiative v. District of Columbia Bd. of Elections & Ethics*, see note 86, infra.

order on June 23, 2006, directing the parties to cooperate in the discovery process and to complete discovery in a timely manner that the protestants were able to depose Johnson, the organization's President, and Jeff Johnson (Tulsa Manager), who ran and organized the NVO campaign in the Tulsa area managing an office identified as PoliticalActivists.org. Even then, Johnson testified to facts and produced documents only on the issues she deemed relevant rather than complying with the subpoena issued.[77] Documents promised for production during the Tulsa Manager's deposition have yet to be produced.

■■■ ¶ 31 A party intentionally concealing evidence necessary for a tribunal to make a correct decision and preventing the complaining party from having its interest fairly presented or fully considered by the court commits fraud.[78]

¶ 32 The record in this case is replete with credible, unchallenged instances of actual fraud in the circulation of petitions. Not only were numerous petition circulators nonresidents of this State, they engaged in outright fraud by using false addresses purportedly to satisfy Oklahoma law.[79] Furthermore, some circulators were encouraged to further the fraud and to hide true residential status by obtaining Oklahoma identification cards. NVO's admitted activities include bringing in numerous out-of-state circulators, contracting with out-of-state firms to come into Oklahoma and collect signatures, allowing at least one foreign national to circulate a petition and having another out-of-state circulator turn in and sign that petition, and encouraging circulators to obtain Oklahoma identification to circumvent any questions regarding their residency while collecting signatures.

¶ 33 These admitted activities constitute criminal activities as defined by the Oklahoma Legislature. The evidence which was uncovered points to systemic wrongdoing; *i.e.,* an established pattern of fraud demonstrated by out-of-state circulators representing themselves as Oklahoma residents when they verified petitions, thereby committing felonies,[80] and by acting as circulators in violation of the requirement that they be *bona fide* Oklahoma residents.[81] The evidence of these activities coupled with NVO's resistance in the discovery process warrant an inference that the entire operation of the organization lacked integrity.[82] With the limited evidence the protestants were able to extract from NVO, it is abundantly clear that the wrongdoing extended all the way to the top of the hierarchy of the organization—Susan Johnson, its President.

¶ 34 Once NVO had collected the number of signatures it deemed necessary to qualify TABOR for the ballot, it removed itself from the state [83] presumably taking its pro circula-

**77.** Deposition of Susan Johnson, June 26, 2006, providing in pertinent part at p. 28:

"... Q Because you didn't have them you made no attempt to comply with [the subpoena *duces tecum* ]?
A. Thank you.
Q Is that right?
A That's true...."

Pages 60 through 72 involve inquires of the protestants concerning documents which were requested in the subpoena *duces tecum* and which were not produced because Johnson did not believe them relevant.

**78.** See, *Red Eagle v. Cannon,* 1945 OK 172, ¶ 21, 177 P.2d 841; *Harjo v. Johnston,* 1940 OK 152, ¶ 0, 104 P.2d 985.

**79.** *Blankenship v. Blackwell,* 341 F.Supp.2d 911, 923 (S.D.Ohio 2004), motion denied, 2004 WL 2390113 (6th Cir.2004), appeal dismissed, 429 F.3d 254 (6th Cir.2005), rehearing and rehearing *en banc* denied (2006).

**80.** Title 34 O.S.2001 § 23, see note 55, supra.

**81.** The Okla. Const. art. 3, § 1, see note 36, supra.

**82.** *Citizens Committee for D.C. Video Lottery Terminal Initiative v. District of Columbia Bd. of Elections & Ethics,* see note 86, infra.

**83.** Transcript of proceedings, July 5, 2006, Alan Lindsey testifying in pertinent part at pp. 67–8:

"... Q. And do you deal with any individual from NVO regarding this—
A. Regarding this?
Q. Procedure?
A. I had had no discussion with anyone from NVO on any serious level about this project. We have talked about other projects but not this one.
Q. I want to go back on—
A. They moved along. To them, this is over, they got the signatures, they're gone...."

tors on to the next most profitable petition drive. **NVO and its out-of-state circulators were paid, imported entities in search of signatories for their own economic benefit—not for the benefit of Oklahoma citizens or their laws. Both Oklahoma's initiative process and its voters deserve more.** The importation of out-of-state residents to obtain signatures for a ballot measure in an Oklahoma state election paid for by out-of-state contributors in which these people have no interest is illegal, fraudulent and unsettling. Such activities may not be countenanced where the Legislature has seen fit to provide safeguards against fraud, corruption and chicanery. It is this Court's duty to ascertain and to give effect to the legislative intent making the safeguards feasible, workable and effective.[84]

¶ 35 The primary purpose of the statutory scheme is to protect the public from corrupting influences that might be brought to bear upon the electoral process by agents who are financially interested in the petition's success. This protection can be fully accorded only if petitions which are tainted by illegal circulation may be barred from the public ballot. If the State's sole remedy is merely a criminal prosecution, then the public will be forced to bear the burden of dealing with the very sort of petition which the statutes seek to prevent. Were we to decree the validity of such a petition, we would be affirmatively sanctioning the type of corruption which the statutes outlaw and we would be depriving the public of the protection which the Legislature has conferred. This we will not do. Therefore, we determine that the initiative petition must be struck in its entirety.[85]

¶ 36 2) **The initiative petition fails for numerical insufficiency of signers.**

¶ 37 The Legislature has provided that procedural requirements of the initiative and referendum process are not mandatory but that substantial compliance is sufficient.[86] We apply this standard, as we have in a long line of Oklahoma jurisprudence.[87] Nevertheless, an independent review of the materials presented during the hearing before the Referee along with the exceptions to the Referee's report confirm that the petition fails for numerical insufficiency.

¶ 38 The gross number of signatures received from the Secretary totaled 299,029. The number of signatures required to place the measure on the ballot is 219,564,[88] requir-

84. *State ex rel. Bryant v. Carter*, 1935 OK 725, ¶ 7, 49 P.2d 217, 102 A.L.R. 47.

85. The decision to invalidate the petition process *in toto* for regularities in the signature collection process is not without extant jurisprudential support. In *Citizens Committee for the D.C. Video Lottery Terminal Initiative v. District of Columbia Board of Elections & Ethics*, 860 A.2d 813 (D.C. 2004), the District of Columbia Court struck all of the petition sheets generated by an out-of-state organization operating much like NVO did here. The District of Columbia Court emphasized that out-of-state circulators who signed the petition committed fraud when indicating they were District of Columbia residents. Furthermore, in some instances, the out-of-state circulators did not actually sign the petition pages collected but would wait until the end of the day when there were in-state circulators ready to fill out the affidavits regarding residency and sign as having been the actual collectors of the signatures. Here, the out-of-state circulators signed the petition pages they collected indicating they were *bona fide* residents of Oklahoma and there was evidence that at least one foreign national collected signatures for which another circulator signed the verification. Finally, another observation from the *Video Lottery* court is instructive—that, where as here, the entity responsible for circulating the petition avoids service and is uncooperative in discovery, it is appropriate to extrapolate from the evidence of wrongdoing presented to a broader conclusion about the integrity of the organization.

86. Title 34 O.S.2001 § 24 provides:

"The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded."

87. *In re Initiative Petition No. 272, State Question No. 409*, see note 59, supra; *In re Referendum Petition No. 130, State Question No. 395*, 1960 OK 185, ¶ 0, 354 P.2d 400; *In re Initiative Petition No. 176, State Question No. 253*, 1940 OK 214, ¶ 0, 102 P.2d 609; *In re Initiative Petition No. 2 of Cushing*, 1932 OK 124, ¶ 0, 10 P.2d 271; *In re State Question No. 137, Referendum Petition No. 49*, 1926 OK 222, ¶ 0, 244 P. 806; *Ramsey v. Persinger*, 1914 OK 205, ¶ 63, 141 P. 13; *Lowther v. Nissley*, 1913 OK 493, ¶ 11, 135 P. 3; *City of Pawhuska v. Pawhuska Oil & Gas Co.*, 1911 OK 124, ¶ 8, 115 P. 353.

88. This figure represents 15% of the votes cast for the state office receiving the highest number of votes at the last general election preceding the

ing that 79,466 challenges be sustained to avoid a vote of the people on the measure.

¶ 39 Indisputable evidence demonstrates that 57,850 signatures must be disallowed as collected by out-of-state circulators.[89] The parties recognize that 7,175[90] signatures must be eliminated for failure of the notary to have a bond in place.[91] A total of 7,071

challenges stand unrebutted.[92] Six hundred and sixty five signatures are disallowed for giving only a post office address in Tulsa and Oklahoma City,[93] and 295 names are disallowed for the date of the signature coinciding with the date of the petition's signing.[94] Finally, 7,048[95] names were successfully challenged on surrebuttal.

filing of the petition. The Okla. Const. art. 5, § 2 provides in pertinent part:

"... and fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition ..."

89. Signatures obtained by non-electors must be disqualified. *In re Initiative Petition No. 365, State Question No. 687*, see note 90 at ¶ 9, infra.

90. The Referee utilized the stipulated number rather than the number reflected in Exhibit 688. See, *In re Referendum Petition No. 18, State Question No. 437*, 1966 OK 152, ¶ 5, 417 P.2d 295; *In re Referendum Petition No. 1, Ordinance 6–B, City of Sand Springs*, 1950 OK 191, ¶ 4, 220 P.2d 454. Nevertheless, because the stipulated figure has been shown to be in error and because acceptance of the stipulated figure is detrimental to the protestants who carry the burden of proof, we choose on *de novo* review (*In re Initiative Petition No. 365, State Question No. 687*, 2001 OK 98, ¶ 3, 55 P.3d 1048, opinion withdrawn and superseded on rehearing (on other grounds), 2001 OK 98, 55 P.3d 1048, rehearing denied (2002); *In re Initiative Petition No. 281, State Question No. 441*, 1967 OK 230, ¶ 5, 434 P.2d 941) to utilize the number for which there is supportive evidence in the record. See, *State ex rel. Oklahoma Bar Ass'n v. Downes*, 2005 OK 33, ¶ 21, 121 P.3d 1058, rehearing granted, opinion modified (on other grounds) (2005); *State ex rel. Oklahoma Bar Ass'n v. Smolen*, 2000 OK 95, ¶ 22, 17 P.3d 456; *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 1992 OK 164, ¶ 11, 848 P.2d 543.

91. Transcript of proceedings, June 21, 2006 providing in pertinent part at pp. 164–65:

"... MR. MAYE: ... We have—they have 7,216 signatures notarized by Melody Eckert. As it stands right now there is no contested evidence but that her—their bond was not in place at that time...."

Notaries whose bonds are not in place are without power to perform notarial acts. *In re Initiative Petition No. 365, State Question No. 687*, see note 90 at ¶ 7, supra.

92. Transcript of proceedings, July 5, 2006, providing in pertinent part at pp. 57–58:

"... Q. So, from these three categories, or these four categories in which some form of name not found or other irregularity, other than finding a name and not finding a matching address or not finding a matching town or not—or finding a P.O. Box, having eliminated

those, what are we left with standing here today as unrebutted signature challenges? A I believe you've got the number right there in the corner. Q. Well, I understand, but tell me anyway. A. I believe that's 7,017...."

Transcript of proceedings, June 21, 2006, providing in pertinent part at p. 26:

"... Q. (By Mr. Echols) Mr. Kiefer, would you read into evidence the challenge numbers listed on Page 1 through 15 that have not been rebutted? MR. ECHOLS: Your honor, that's how we would make the offer and it could be quite voluminous, but the numbers are what they are. HEARING OFFICER: And he would read out 5,828 numbers? MR. ECHOLS: Yes, Your Honor, that would be his—..."

93. *Id.*

94. Transcript of proceedings, July 5, 2006, providing in pertinent part at p. 71:

"... Q. (By Mr. Echols) Absolutely. Let's go back. I believe you testified just yes or no, you never looked at the dates of registration? A. I can't make any statement of any kind about the dates. I didn't look at them. I don't know a thing about them. I misunderstood what they were...."

Signatures obtained on the date of signing a petition are disallowed. *In re Initiative Petition No. 365, State Question No. 687*, see note 90 at ¶ 11, supra. See also, 34 O.S.2001 § 23.

95. This number comes with an actual physical count and comparison of the last 83,204 surrebuttals presented by the protestants. For this reason, it differs from the figure presented by the Referee in the report of July 24, 2006. The challenges were presented to the proponents on June 29th over their objection. On July 10, 2006, the protestants withdrew 3,815 challenges and submitted their surrebuttals which were admitted without objection. Only those surrebuttals related to the voter's name not being found were considered for purposes of the signature count. It is also interesting to note that this number seems minimal when compared with the proponents having willingly withdrawn objections to over 5,000 challenges when it considered the first 23,674 challenges presented by the prot-

¶ 40 Without considering the more than 75,000 protestant challenges based on non-matching addresses,[96] the total number of successful challenges is 80,014. The protestants' signature collection effort failed by a minimum of 638 legally sufficient signatures. Therefore, it is abundantly clear that, even if we had determined to take the narrowest feasible remedy and exclude only the petition sheets of NVO's and other organization's out-of-state circulators rather than to strike the TABOR petition in its entirety, it would be inappropriate for the initiative to go to a vote of the people as an insufficient number of signatures were collected to qualify the proposal for the ballot.

## CONCLUSION

¶ 41 There was some evidence in the cock-fighting petition—*In re Initiative Petition No. 365, State Question No. 687,* 2001 OK 98, 55 P.3d 1048, opinion withdrawn and superseded on rehearing (on other grounds), 55 P.3d 1048, 2001 OK 98, rehearing denied (2002)—of the participation of out-of-state circulators involved in the signature collection process. 7,542 signatures collected by a single circulator who was determined not to be a qualified elector because he was not an Oklahoma resident were struck from the signature count. The cockfighting case was decided in 2001. Five years later, with the circulation of the TABOR petition, in excess of 57,000 votes are being disqualified on the same basis with evidence that there were in excess of 60 out-of-state circulators involved.[97] **There is no way to determine with any sort of accuracy exactly how many signatures were collected by these out—of state residents as the petition supporters did everything possible to avoid discovery—even the successful discovery was largely unusable because deponents essentially "couldn't remember" or "didn't know" the information attempting to be elicited.** Most certainly, if we do not take the opportunity to address the issue of the effect of out-of-state intrusions into a process reserved to *bona fide* residents of the State of Oklahoma, the problem will only grow and will present itself as a part of essentially every citizen circulation.

¶ 42 Excluding all petitions associated with the TABOR initiative does not disenfranchise

---

estants—challenges which it admits it took considerably more time to analyze.

**96.** The Referee took the position that such challenges were essentially eliminated by the Court's opinion in *In re Initiative Petition No. 365, State Question 687,* see note 90, supra. Although this appears to be an over-broad generalization of the analysis in the opinion, these challenges were not addressed because they are not necessary to defeat the cause for numerical insufficiency.

**97.** Transcript of proceedings, June 16, 2006, the following represents a portion of the deposition of Richard Carpenter by the protestants and read into the record:

at p. 38: "... Q. You have a reference that says, 'Our Missouri crew of six, one dropped, that arrived on Wednesday have collected just 1,500 signatures over their first four days circulating.' What do you mean by that?
A. They weren't collecting very many signatures.
 Q. Actually I'm more interested in our Missouri crew. They were from Missouri, weren't they?
 A. I don't know....;"
at p. 44: "... Q. In the next paragraph she [Susan Johnson the President of the out-of-circulator organization, V.P.O.] states, 'I have 12 pros confirmed still in town today.' Do you see that?
A. Yeah.
A. I don't know....;"
at p. 46: "... Q. She says we have commitment from 62 pros to be in the state by Friday; is that correct?
"A. Yes.
Q. Where were they coming from?
A. I don't know....;"
at pp. 47–48: "... Q. Okay. If you would, please to go 75. And what is this e-mail to you, Craig Regens. Who is Craig Regens?
A. I don't know.
Q. Paul Jacobs. If you just could, please read for the record the second paragraph?
A. What, 214,000 is now due?
Q. Uh-huh.
A. '214,000 is now due for work already completed with at least 20,000 more due or Monday's turn-ins. The contract states that all signatures are purchased in advance. The unusable check was deposited in your bank account on Tuesday for a mere 75,000 only raises more concern as to why the rest of the funds necessary to keep going continue to elude the committee's and my bank account. You have put me in a very precarious situation, even more funds were committed today by bringing in the Calvary.....';"

voters. Rather, it upholds the integrity of the initiative process that has been undermined by criminal wrongdoing and fraud.[98] The Legislature has imposed strong sanctions for such wrongdoing.[99] NVO and its out-of-state circulators committed much more than mere technical violations of Oklahoma law—they attempted to destroy the safeguards by which signatures are obtained and verified. Nothing less than the strong sanction of voiding the entire petition will serve to deter similar activity in the future and to protect the precious right of the initiative to Oklahoma voters. Finally, the petition fails for numerical insufficiency.

**INITIATIVE PETITION No. 379 IS DECLARED INVALID FOR ILLEGALITY AND FRAUD IN THE SIGNATURE COLLECTION PROCESS AND FOR NUMERICAL INSUFFICIENCY OF SIGNERS.**

WINCHESTER, V.C.J., KAUGER, EDMONDSON, TAYLOR, COLBERT, J.J. concur.

LAVENDER, HARGRAVE, OPALA, J.J. concur in result.

**98.** *Citizens Committee for D.C. Video Lottery Terminal Initiative v. District of Columbia Bd. of Elections & Ethics,* see note 86, supra; *Williams v. District of Columbia Bd. of Elections & Ethics,* 804 A.2d 316, 318 (D.C.2002), as corrected (2002).

**99.** Title 34 O.S.2001 § 3.1, see note 53, supra; 34 O.S.2001 § 23, see note 55, supra.